987 P.2d 1015

**H. Stanley JONES and Roberta Jones, Plaintiffs–Appellants,**

v.

**Bill PHILLIPSON and Happy Vincent, Defendants–Appellees,**

and

**John Does 1–10, Doe Entities 1–10, Doe Partnerships 1–10, and Doe Corporations 1–10, Defendants.**

No. 20799.

Intermediate Court of Appeals of Hawai'i.

Jan. 28, 1999.

---

John H. Murphy, Lihue, on the briefs, for plaintiffs-appellants.

Malvin D. Dohrman, Kilauea, on the brief, for defendants-appellees.

BURNS, C.J., ACOBA, and KIRIMITSU, JJ.

Opinion of the Court by ACOBA, J.

We hold that while Hawai'i Revised Statutes (HRS) § 444–22 (1993) bars an unlicensed contractor from maintaining an action to recover for contracting services, where the other party to the contract is a member of the general public, that party can maintain an action on the contract against the unlicensed contractor.

We further hold that where such a party violates the owner-builder exemption under HRS § 444–2(7) (1993) by selling or leasing the subject property within one year of completion, that party may be subject to the sanctions imposed under HRS § 444–2(7), but will be able to maintain an action against the unlicensed contractor for breach of contract. We believe that in such a situation, and under the statutory scheme applicable to the case before us, non-enforceability of such a contract would be an additional penalty beyond that already authorized by HRS § 444–2(7) and is not warranted.

The district court of the fifth circuit (the court) held to the contrary as to the claim for breach of contract in Count I of the complaint filed by Plaintiffs–Appellants H. Stanley Jones (Stanley) and Roberta Jones (Roberta) (collectively, Plaintiffs), and therefore, we vacate that part of the September 26, 1996 judgment entered by the court which pertained to Count I of the complaint, and remand Count I for retrial. However, as to Plaintiffs' claims for fraud and punitive damages in Counts II and III, respectively, of their complaint, we affirm that part of the judgment in favor of Defendants–Appellees Bill Phillipson (Phillipson) and Happy Vincent (Vincent) (collectively, Defendants).

### I.

Plaintiffs, along with Violet M. Trobough[1] (Trobough), owned property located at 4610

1. According to the record, Violet M. Trobough was acting as the Trustee of the Violet M. Trobough Trust during the times relevant.

Kapuna Road, Kilauea, Kaua'i, Hawai'i (the property). Sometime in November 1994, Plaintiffs applied for a building permit for the property. As part of the application process, Stanley completed a contractor's statement dated November 28, 1994 (the contractor's statement) which listed Plaintiffs as the "Owner, Applicant, Contractor." [2] In the contractor's statement, Stanley certified that he and Roberta were owners or lessees of the property, and as such, were exempt from contractor licensing laws under HRS chapter 444 (1993).

On March 17, 1995, the County of Kaua'i issued the building permit for the property. The permit listed Stanley as the owner of the property and designated the "contractor" as "self-builder."

On or about September 29, 1995, Stanley, on behalf of Plaintiffs, entered into an oral agreement (the agreement) with Defendants. According to the agreement, Defendants agreed to build a one-story, single-family residence (the residence) on the property. Plaintiffs agreed to pay Defendants a "fixed price" of $60,000 for the work plus fifty percent of Defendants' "tax liability." [3] Payments in the amount of $1,250 were to be made weekly to Defendants. At the time the agreement was entered into, neither Phillipson nor Vincent were licensed contractors, and Stanley knew this. [4]

Plaintiffs made payments to Defendants totalling at least $60,000. However, on or

about April 15, 1996, and prior to completion of the residence, Defendants stopped work on the residence. [5]

Stanley hired Frank Henderson (Henderson) to complete the construction of the residence. Henderson was not a licensed contractor. Plaintiffs paid Henderson in excess of $20,000 to complete construction of the residence. [6]

Although Stanley testified that he originally intended that either Trobough or Stanley's daughter and son-in-law occupy the residence, the residence was leased to a Ms. Stryder (Stryder), a member of the general public, one day after Plaintiffs were issued a certificate of occupancy by the County of Kaua'i. [7]

## II.

## A.

On May 24, 1996, Plaintiffs filed their complaint against Defendants, asserting, as stated previously, causes of action for breach of contract in Count I, fraud in Count II, and punitive damages in Count III.

Defendants filed their answer to the complaint on June 19, 1996. In the answer, Defendants admitted that they had been paid a total of $61,500 for work on the residence, but denied all other allegations made in Counts I, II, and III. Defendants expressly set forth several specific defenses, [8] and fur-

---

2. The building permit application is not in the record. The contractor's statement, signed by Plaintiff–Appellant H. Stanley Jones (Stanley) and dated November 28, 1994, was submitted by Defendants–Appellees Bill Phillipson (Phillipson) and Happy Vincent (Vincent) (collectively, Defendants) (the contractor's statement) and admitted as Exhibit A. According to the contractor's statement, the building permit application and contractor's statement together were to be filed with the Kaua'i County Department of Public Works.

3. From the record, it is not clear to what "tax liability" refers.

4. The district court of the fifth circuit (the court) entered its findings of fact (findings) and conclusions of law on October 21, 1996. In its finding 6, the court found that Stanley knew neither Defendant had a contractor's license at the time

of the oral agreement. Stanley and Plaintiff–Appellant Roberta Jones (collectively, Plaintiffs) do not contest this finding, therefore we treat it as true.

5. At trial, Plaintiffs contended that Defendants stopped work on the property after Stanley refused to pay Defendants' request for additional payments. Defendants, however, maintained that they stopped working because Plaintiffs' funds were exhausted.

6. Although Plaintiffs apparently paid more than $20,000 to Frank Henderson, their claim for this expense was only $20,000.

7. This was in the court's finding 12, and is uncontested by Plaintiffs.

8. In their answer, Defendants listed the following defenses: (1) unclean hands; (2) laches and/or waiver; (3) estoppel and/or res judicata; (4) col-

ther stated that they "give notice that they intend[ed] to rely upon any other matter constituting an avoidance or affirmative defense as set forth in [Hawai'i Rules of Civil Procedure (HRCP) ] Rule 8(c)[.]" [9]

### B.

Trial was held on August 23, 26, and 27, 1996. During closing arguments, Defendants' counsel, for the first time, raised the defense that the agreement was illegal, and therefore unenforceable. Plaintiffs did not object, but addressed the merits of this defense in response to questioning by the court. At the close of trial, the court took the case under advisement and allowed Plaintiffs and Defendants eight days to submit additional memoranda of law as to whether the agreement was illegal.

On September 4, 1996, Defendants filed their post-trial memorandum of law. In their memorandum, Defendants maintained that (1) they were not estopped from raising the illegality defense because their answer notified Plaintiffs of the intention to rely on the defenses listed in HRCP Rule 8(c); (2) the agreement was "an illegal contract with persons without a contractor's license" and therefore, unenforceable under HRS § 444–22; [10] and (3) Stanley was *in pari delicto* with Defendants because he had violated the owner-builder exemption afforded by HRS §§ 444–2(7) and –9.1 by leasing the property to a member of the general public within one year of completion.

Also on September 4, 1996, Plaintiffs filed their post-trial memorandum of law. Plaintiffs contended that (1) Defendants waived

the defense of illegality by failing to raise it before trial; (2) even if the agreement was illegal, it was not void, and the court should enforce the agreement; and (3) the agreement should be enforced even if Stanley violated HRS §§ 444–2(7) and –9.1.

### C.

On September 26, 1996, the court entered judgment in favor of Defendants and against Plaintiffs.

On October 21, 1996, the court filed its findings of fact (findings) and conclusions of law (conclusions).

On June 4, 1997, the court entered an order denying Plaintiffs' motion for reconsideration and to alter or amend the judgment.

On June 23, 1997, Plaintiffs appealed from the judgment and findings and conclusions.

### III.

On appeal, Plaintiffs essentially argue that the court erred in (1) making findings 1, 7, 11, and 13; (2) denying relief on Counts II and III of their complaint; (3) allowing Defendants to untimely raise the defense of illegality of contract; (4) concluding that the agreement was void, or alternatively, that it was illegal and unenforceable. [11]

### IV.

#### A.

The challenged findings stated as follows:

lateral estoppel and/or release; and (5) failure to join a needed party pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 19(a).

9. Defendants erroneously referred to HRCP Rule 8(c). Because this action was brought in the district court, District Court Rules of Civil Procedure (DCRCP) Rule 8(c) applied. *See* discussion, *infra*.

10. Defendants also claimed that they were employees of Plaintiffs because they were being paid a weekly wage, but they do not raise this fourth issue on appeal.

11. From the record, it appears that Plaintiffs filed two prior opening briefs which were stricken for failure to comply with Hawai'i Rules of

Appellate Procedure (HRAP) Rule 28. Hence, we consider only matters raised in Plaintiffs' second amended opening brief.

Defendants declined to file any additional or amended answering briefs in response to Plaintiffs' second amended opening brief. In their answering brief, Defendants argue that Plaintiffs waived their appeal of the court's findings and conclusions for failure to properly set out the text of the findings and conclusions in compliance with HRAP Rule 28. However, reviewing Plaintiffs' second amended opening brief, it appears that this defect has been corrected. Thus, we do not address Defendants' arguments with respect to this purported error.

1. [Plaintiffs] own a 50% interest in the property[.]

. . . .

7. That [Defendants] did not make any false representations when they entered into the . . . agreement with [Stanley].

. . . .

11. [Plaintiffs] were not penalized by [Defendants'] failing to complete the agreement.

. . . .

13. That there was no evidence of any wilful or malicious conduct on the part of [Plaintiffs].

 The applicable standard of review for findings of fact is the clearly erroneous standard. *Cho Mark Oriental Food v. K & K Int'l,* 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992). A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, "the appellate court is left with the definite and firm conviction that a mistake has been made." *Hirono v. Peabody,* 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996) (citations and internal quotation marks omitted).

However, in their briefs, Plaintiffs fail to refer to any specific evidence which would controvert findings 1, 7, and 13. Because Plaintiffs present no discernible argument with respect to the alleged erroneous nature of these findings, we need not address this issue. *Loui v. Board of Medical Examiners,* 78 Hawai'i 21, 29 n. 19, 889 P.2d 705, 713 n. 19 (1995).

 Further, upon review of the record, we cannot say that findings 1, 7, and 13 were clearly erroneous. With respect to finding 1, Stanley testified that the property was co-owned by him, his wife, and Trobough. Evidence of the negotiations between the parties support finding 7; there is no evidence that at the time the parties entered into the agreement, Defendants falsely represented their status as unlicensed contractors or their ability to complete the construction for $60,-000. In fact, it is uncontested that Plaintiffs knew Defendants were unlicensed. As to finding 13, the evidence fails to demonstrate that Defendants acted fraudulently. While there is evidence that Defendants did not complete construction of the residence, there is no evidence, aside from Stanley's speculative testimony, that Defendants purposely deceived Plaintiffs or otherwise acted wilfully or maliciously with respect to the agreement and the completion of construction.

### B.

Findings 7 and 13 relate to Counts II and III of the complaint, which, as previously indicated, pled fraud and punitive damages, respectively. The court did not make any specific conclusions with respect to Counts II and III, but in conclusion 5, stated broadly that Plaintiffs "should take nothing by reason of their complaint and that judgment be entered" in favor of Defendants. Because we see no error in findings 7 and 13, we conclude the court correctly denied Plaintiffs' relief under Counts II and III. Accordingly, we affirm conclusion 5 with respect to Counts II and III.

### C.

 With respect to finding 11, however, we believe there is evidence that Plaintiffs suffered damage as a result of Defendants' failure to complete the agreement. It is undisputed that Plaintiffs paid another contractor to complete construction. In light of our holding that Plaintiffs are not barred from maintaining an action on the agreement, *see* discussion *infra,* we vacate finding 11.

### V.

Plaintiffs' third argument is that Defendants waived the defense of illegality because Defendants failed to specifically plead it in their answer. The court did not make any findings or conclusions with respect to this issue.

Under District Court Rules of Civil Procedure (DCRCP) Rule 8(b), Defendants were allowed to either make a general denial or file an answer to the complaint. Rule 8(b) provides, in relevant part, that "(1) [a] defendant may defend by filing an answer on the return day or within the time ordered by the

court; [and] (2) an appearance without written answer shall be deemed to constitute a general denial of the truth of the facts stated in the complaint[.] ... " As to an answer, "[e]very defense, in law or fact *may* be asserted in a written answer." DCRCP Rule 12(b) (emphasis added).

■ Illegality is an affirmative defense. *See* DCRCP Rule 8(c). "An affirmative defense would defeat a plaintiff's claim if it is accepted by the court and it serves the purpose of giving the opposing party *notice* of the defense and *an opportunity to argue* why his or her claim should not be barred completely." *Romero v. Star Mkts.*, 82 Hawai'i 405, 416, 922 P.2d 1018, 1029 (App.1996) (emphases added) (internal quotation marks and brackets omitted); *see also* 5 C. Wright and A. Miller, *Federal Practice and Procedure: Civil 2d* § 1270, at 414 (1990). A general reference to "any other matter constituting an avoidance or affirmative defense" would obviously not provide the necessary notice that Defendants intended to specifically rely on illegality as an affirmative defense.

■ However, we believe, on the facts of this case, that Plaintiffs had sufficient opportunity to respond to the defense. Once the issue of illegality was brought before the court, Plaintiffs did not object, but argued the issue. The court subsequently allowed both Plaintiffs and Defendants a reasonable time to submit memoranda on the defense before rendering its decision. Hence, we conclude that Defendants did not as a matter of law "waive" the defense as urged by Plaintiffs.

## VI.

■ Plaintiffs challenge the court's conclusions relating to the purported illegality of the agreement. In this regard, we review conclusions 2 and 3 which indicated that the agreement itself was illegal under HRS chapter 444, and thus, impliedly, that it was unenforceable by Plaintiffs:

2. That the oral agreement entered into between ... Plaintiffs and [Defendants] was an illegal agreement in violation of HRS [ c]hapter 444.

3. That in entering into the agreement and having unlicensed persons build the residence on the [p]roperty, Plaintiffs were not exempt within the provisions of HRS [ c]hapter 444 and violated the [b]uilding [p]ermit issued by the County of [Kaua'i].

We review a trial court's conclusions of law under the right/wrong standard. *Wharton v. Hawaiian Elec. Co.*, 80 Hawai'i 120, 122, 906 P.2d 127, 129 (1995) (holding that legal conclusions are freely reviewable by an appellate court).

### A.

HRS § 444–22 prohibits any person who does not comply with the provisions of HRS chapter 444 from bringing a civil action to recover for work done or materials furnished on a contract or quantum meruit basis:

The failure of any person to comply with any provision of this chapter *shall prevent such person from recovering for work done, or materials or supplies furnished, or both on a contract or on the basis of the reasonable value thereof,* in a civil action, if such person failed to obtain a license under this chapter prior to contracting for such work.

(Emphasis added.)

■ The Hawai'i Supreme Court has indicated that "HRS [c]hapter 444, providing for the licensing of contractors[,] expresses a *very strong public policy* that contractors in this state should apply for, and receive licenses, and the provisions of HRS § 444–22, which are sweeping in their terms, are obviously intended to produce harsh results in furtherance of that policy." *Butler v. Obayashi*, 71 Haw. 175, 177, 785 P.2d 1324, 1325 (1990) (emphasis added). Thus, in *Butler*, the supreme court held that despite a contracting party's knowledge of the contractor's unlicensed status, suit by the unlicensed contractor against that party was barred. *Id.* Clearly, then, a contractor's claim to recover compensation for unlicensed work may not be enforced in our courts. *See Shultz v. Lujan*, 86 Hawai'i 137, 141, 948 P.2d 558, 560 (App.1997).

However, the question remains of whether a member of the general public may, in our courts, enforce a contract with an unlicensed

contractor, or whether such a contract is void *ab initio* as against public policy as was implied by the court.

### B.

Other jurisdictions hold that an unlicensed contractor cannot enforce a contract, but "recognize[ ] that ... the other party to the contract, not being in pari delicto with the contractor ... and being a member of the class to be protected by the statute or ordinance, has generally been allowed to recover damages from the unlicensed ... contractor for breach of the contract." Annotation, *Failure of Building and Construction Artisan or Contractor to Procure Business or Occupational License as Affecting Enforceability of Contract or Right of Recovery for Work Done—Modern Cases,* 44 A.L.R.4th 271 (hereinafter Annot., *Failure of Building and Construction Artisan,* 44 A.L.R.4th), § 2[a] at 278 (1986). For example, in *Domach v. Spencer,* 101 Cal.App.3d 308, 161 Cal.Rptr. 459, 460 (App.1980), a California court of appeals held that a statute similar to HRS § 444–22 "bar[red] an unlicensed contractor from maintaining an action on the building contract, *but does not bar a member of the public from bringing such an action.*" (Emphasis added). In that case, plaintiffs entered into a contract with defendants who were unlicensed contractors. Under the contract, plaintiffs agreed to pay defendants $37,000 to build a home for them. *Id.* However, near the time of completion, defendants demanded more money to complete the work. *Id.* Plaintiffs paid a total of $54,000 to defendants. *Id.*

In their complaint, plaintiffs "alleged that defendants were not licensed contractors, that the home was not constructed in accordance with the specifications [agreed upon], and that it was constructed in a sloppy, incompetent and unworkmanlike manner." *Id.* Plaintiffs sought the return of all amounts paid to defendants plus the payment of amounts necessary to complete construction of the home in compliance with the specifications. *Id.* The trial court entered judgment in favor of plaintiffs and ordered defendants to pay $10,276.[12] *Id.* at 461.

The statute in *Domach,* like HRS § 444–22, precluded suits by unlicensed contractors:

"No person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action in any court of this state for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times during the performance of such act or contract[.]"

*Id.* (quoting Business & Professions Code § 7031). The appellate court explained that the statute "bars an unlicensed builder from bringing or maintaining a suit on a construction contract; *it does not shield such a person from a suit arising out of such a contract.*" *Id.* (emphasis added) (footnote omitted).

In *Domach,* the defendants argued that plaintiffs should be barred from "bringing or maintaining a suit on the contract since they would be parties to an illegal contract." *Id.* The court of appeals, however, disagreed, noting that the purpose behind requiring the licensing of contractors is "the protection of the public." *Id.* According to the appellate court, "[p]laintiffs, as members of the public, [were] within the class for whose benefit the statute was passed and thus cannot be regarded as being in pari delicto with" the defendants. *Id.* In affirming the trial court, it went on to conclude that to hold otherwise would defeat the purpose of the statute:

The bar of [the contractor licensing statute] applies by its terms only to the person acting in the capacity of a contractor and not to a member of the public. To apply that statute to members of the public would defeat its purpose by providing a shield from litigation for an unlicensed builder due to the fortuity that he had been paid.

*Id.* at 461–62.

Several other jurisdictions have similarly held that persons contracting with unlicensed contractors are not barred from bringing actions for breach of contract against those

---

12. The opinion does not explain to what the damages were attributed.

contractors. *See, e.g., Davidson v. Hensen*, 135 Wash.2d 112, 954 P.2d 1327, 1335 (1998) (holding that a contract between a homeowner and an unlicensed contractor is not void *ab initio* and that it "has limited enforceability"); *Truitt v. Miller*, 407 A.2d 1073, 1079 (D.C.App.1979) (allowing a homeowner to repudiate a contract entered into with an unlicensed contractor and holding that even though the homeowner may have been "technically" *in pari delicto* for writing a check on insufficient funds, the homeowner could recover the amounts paid under the contract because the contractor licensing law was passed to protect homeowners and "the purposes of the law would be better effectuated by granting relief than by denying it") (internal quotation marks omitted); *Watson v. Welton*, 115 Ariz. 76, 563 P.2d 331, 335 (Ariz.App.1977) (holding that while a "contractor who [enters into a contract which] exceeds his [or her] license cannot sue for a balance due" on the contract, the contractor remains liable to the other party to the contract and cannot "escape liability by the simple device of not complying with the law"); *See* Annot., *Failure of Building and Construction Artisan*, 44 A.L.R.4th 271, § 9 at 315. *See also* 6A *Corbin on Contracts* § 1510, at 707 (1962) ("There can be no doubt that a bargain made by an unlicensed guilty [person] with another person who is innocent of [the] offense is not totally void. It would be a rare or non-existent case in which such an innocent person could not maintain some kind of action for a breach of the agreement by the guilty party who was wrongfully engaged in business.") (footnote omitted).

### C.

We find the reasoning of *Domach* and the foregoing authorities persuasive in light of the provisions of HRS chapter 444 and its purpose.

Laws regulating contractor licensing in Hawai'i were enacted as early as 1957. 1957 Haw. Sess. L. Act 305, at 358–67.[13] The purpose behind requiring contractor licensing was to "protect the general public against

dishonest, fraudulent, unskillful or unqualified contractors." Sen. Stand. Comm. Rep. No. 630, in 1957 Senate Journal, at 617.

HRS § 444–4 confirms this purpose in providing that a contractors' licensing board "shall ... [a]dopt, amend or repeal such rules ... to effectuate [HRS] chapter [444] and *carry out the purpose thereof, which is the protection of the general public.*"

■ Various amendments have been made to HRS chapter 444, but the primary purpose of the chapter remains intact. A recent legislative report observed that

[HRS] [c]hapter 444 requires that individuals licensed as contractors pass a written exam and meet the experiential requirements set by the board. Licensed contractors are also required to maintain workers' compensation and liability insurance. *These laws were enacted, in part, to ensure the health and safety of the public by requiring that contractors possess a minimum level of expertise, experience and training.*

Hse. Stand. Comm. Rep. No. 727–96, in 1996 House Journal, at 1309 (emphasis added). Thus, the purpose of HRS chapter 444 is to protect members of the public from poor workmanship by requiring that only contractors meeting a minimum level of qualifications be licensed.

■ In apparent vindication of this purpose, HRS § 444–22 bars civil actions by unlicensed contractors. Like the California statute in *Domach*, HRS § 444–22 is aimed at "the person acting in the capacity of a contractor and not [at] a member of the public." *Domach*, 161 Cal.Rptr. at 461. Only a person who "fail[s] to comply" with the licensing requirements of HRS chapter 444 is "prevent[ed] from recovering for work done, or for materials or supplies furnished, or both on a contract or upon the basis of the reasonable value thereof." HRS § 444–22. Thus, HRS § 444–22 on its face does not "bar a member of the public" from bringing an action on such a contract. *Domach*, 161 Cal.Rptr. at 460. If we were to apply HRS

---

13. Act 305 was subsequently codified in the 1965 Supplement of the 1955 Revised Laws of Hawai'i (RLH) as chapter 166A. In 1968, RLH chapter 166A was recodified as Hawai'i Revised Statutes (HRS) chapter 444.

§ 444–22 to bar members of the public from suing on such contracts, we "would defeat its purpose [of protecting the general public] by providing a shield from litigation for an unlicensed builder[.]" *Id.* at 462. In our view, then, a member of the public who enters into a contract with an unlicensed contractor comes within "the class for whose benefit [HRS chapter 444] was passed and thus cannot be regarded as being in pari delicto with the [contractor]." *Id.* at 461.

 Accordingly, we hold that a contract with an unlicensed contractor is not void *ab initio* and HRS § 444–22 does not bar a member of the public, who is a party to such a contract, from bringing suit to recover breach of contract damages from an unlicensed contractor.[14]

## VII.

The court, however, apparently further concluded that because Plaintiffs violated HRS §§ 444–2(7) and –9.1, they were *in pari delicto* with Defendants and thus precluded from recovering on the contract. In entering judgment for Defendants, the court's relevant conclusions were as follows:

1. That the construction of the residence on the [p]roperty was undertaken for the purpose of leasing the residence to the general public in violation of the exemption provided in HRS §§ 444–2(7) and 444–9.1.

. . . .

4. That Plaintiffs were in pari delicto by constructing the residence on the [p]roperty for the purpose of leasing it to the general public, by falsely representing that they were to be the "[s]elf[-][b]uilder"

contractor within the provisions of HRS §§ 444–2(7) and 444–9.1, and by violating the [b]uilding [p]ermit issued by the County of [Kauaʻi].

5. That Plaintiffs should take nothing by reason of their complaint and that judgment be entered for [Defendants] and against Plaintiffs[.]

### A.

Preliminarily, we observe that the definition of "contractor" in HRS § 444–9 provides that one may not "act, or assume to act, or advertise, as [a contractor] without a license previously obtained under and in compliance with this chapter[.]"

However, HRS § 444–2 sets forth various exemptions to the operation of HRS chapter 444. One of these, the owner-builder exemption in HRS § 444–2(7)[15] referred to by the court, exempts owners or lessees building or improving property for their or their close relatives' use from the requirements of chapter 444:

Owners or lessees of property who build or improve residential, farm, industrial, or commercial buildings or structures on property for their own use, or for use by their grandparents, parents, siblings, or children and *do not offer the buildings or structures for sale or lease* [will not be subject to HRS chapter 444.]

(Emphasis added.) Thus, owners or lessees of property are permitted to act as contractors without being licensed, provided the property involved will be used only by the owners or lessees or their family members.

HRS § 444–2(7) further provides that a sale or lease or offer therefor of the property within one year following completion of a

---

14. We also note that it is generally agreed that where "an action is brought on the contract [against an unlicensed contractor], the unlicensed contractor ... has ... been allowed to assert the contract defensively to offset the claims of the contractee." Annotation, *Failure of Building and Construction Artisan or Contractor to Procure Business or Occupational License as Affecting Enforceability of Contract or Right of Recovery for Work Done—Modern Cases*, 44 A.L.R.4th 271, § 2[a] at 279 (1986). Hence, we believe that where a member of the general public sues an unlicensed contractor for breach of

contract, the unlicensed contractor may raise defenses which arise under the contract.

15. HRS § 444–2(7) (Supp.1998) was amended in 1996 by adding the following sentence: "There is a presumption that an owner or lessee has violated this section, when the owner or lessee obtains an exemption from the licensing requirements of section 444–9 more than once in two years[.]" This amendment, enacted after Stanley applied for the building permit, does not affect this appeal.

structure is "prima facie evidence" that the builder was not acting as an owner or lessee:

> [P]roof of the sale or lease, or offering for sale or lease of the structure *within one year after completion is prima facie evidence that the construction or improvement of the structure was undertaken for the purpose of sale or lease;* provided that this shall not apply to residential properties sold or leased to employees of the owner or lessee; *provided further that in order to qualify for this exemption the owner or lessee must register for the exemptions as provided in [HRS § ] 444–9.1.*

(Emphases added). At the time of the agreement between Plaintiffs and Defendants, the section further stated that any owner or lessee who violated HRS § 444–2(7) "shall not be permitted to engage in any activities pursuant to [HRS § 444–2(7) ] or to register under [HRS § ] 444–9.1 for a period of three years." HRS § 444–2(7).

Under the version of HRS § 444–9.1 then in effect,[16] all applicants claiming an exemption under HRS § 444–2(7) were required to file a statement setting forth the basis for the claimed exemption and "to certify that the building or structure is for the applicant's personal use and not for use or occupancy by the general public." Once an applicant filed the statement and otherwise complied with HRS § 444–9.1, the applicant was issued a building permit.

HRS § 444–2(7) did not provide a specific sanction for its violation until 1992, when the legislature added the provision that "[a]ny owner or lessee of property found to have violated [HRS § 444–2(7) ] shall not be permitted to" claim an exemption under HRS § 444–2(7) for a period of three years. 1992 Haw. Sess. L., Act 269, § 2, at 710.

**16.** In 1996, a new section (c) was added to HRS § 444–9.1 (Supp.1998) which required notification to an applicant requesting an owner-builder exemption of the potential liability for fines. *See* note 17 *infra.*

**17.** In 1996, the legislature prescribed fines for the violation of HRS § 444–2(7). HRS § 444–23(e) (Supp.1998) stated as follows:
> (e) *Any person who violates [HRS §] 444–2(7), shall be fined:*

We interpret the foregoing legislative history as indicating that the only specific sanction for violation of the owner-builder exemption during the relevant time period of this case, was the three-year disqualification from claiming the owner-builder exemption.[17]

### B.

Plaintiffs applied for an exemption under HRS § 444–2(7), filed the requisite statement under HRS § 444–9.1, and received a building permit based on their claimed owner-builder status. It is uncontroverted that the day after a certificate of occupancy was issued for the residence, Plaintiffs leased the residence to Stryder, a member of the general public. Thus, Plaintiffs violated HRS § 444–2(7) which forbade an owner-builder from "offer[ing] the buildings or structures for sale or lease[,]" and HRS § 444–9.1 which required certification of their "personal use" of the property.

Further, the lease to Stryder constituted "prima facie evidence that the construction or improvement of the structure was undertaken for the purpose of sale or lease." HRS § 444–2(7). As noted earlier, *see supra* n. 7, Plaintiffs failed to contest the finding on this matter; therefore, we take as established that Plaintiffs' construction of the residence was undertaken for the purpose of selling or leasing the residence. Under the statutory scheme applicable to the events in this case, Plaintiffs' violation of HRS § 444–2(7) would prevent them from "engag[ing] in any activities pursuant to [HRS § 444–2(7) ] or ... register[ing] under section 444–9.1 for a period of three years." HRS § 444–2(7).

### VIII.

In our view, however, Plaintiffs should not be foreclosed from enforcing their contract with Defendants.

> (1) $5,000 or forty per cent of the appraised value of the building as determined by the county tax appraiser, whichever is greater, for the first offense; and
> (2) $10,000 or fifty per cent of the appraised value of the building as determined by the county tax appraiser, whichever is greater, for any subsequent offenses.

(Emphasis added).

In considering whether the violation of a statute should preclude the wrongdoer from enforcing a contract, the Hawai'i Supreme Court has said:

[W]here a statute is silent with respect to the enforceability of a contract whose performance is malum prohibitum, the legislature could not have intended unenforceability where a forfeiture, *wholly out of proportion to the requirements of public policy or appropriate individual punishment, would result and redound solely to the benefit of defendant.*

*Wilson v. Kealakekua Ranch, Ltd.* 57 Haw. 124, 129, 551 P.2d 525, 528–29 (1976) (emphasis added).

▪ Applying the foregoing proposition, we conclude that while the purpose behind the owner-builder exemption is the protection of the public, barring Plaintiffs' action would amount to a forfeiture "wholly out of proportion to the requirements of public policy [and] appropriate individual punishment," and would only "redound ... to the benefit" of Defendants. *Id.* at 129, 551 P.2d at 529 (internal quotation marks omitted). The supreme court has pointed out that " 'even in these cases [where the statute is for the protection of the public] enforcement of the wrongdoer's bargains is not always denied him [or her].' " *Id.* at 128, 551 P.2d at 528 (quoting 6A *Corbin on Contracts* § 1512, at 712–14) (brackets omitted). For, " '[j]ustice requires that the penalty ... fit the crime; ... justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going ... to repudiating defendants.' " *Id.* (quoting 6A *Corbin on Contracts* § 1512, at 712–14) (emphasis omitted).

In this case, denying Plaintiffs their right to sue would amount to a windfall of as much as $20,000 to Defendants, who were unlicensed contractors. This result, essentially shielding unlicensed contractors from suit in certain cases, clashes with the "very strong public policy" that contractors should be licensed. *Butler,* 71 Haw. at 177, 785 P.2d at 1325. Were Plaintiffs prevented from pursuing their claim, the outcome of our decision would "redound solely to the benefit of ... [D]efendant[s]." *Wilson,* 57 Haw. at 129, 551

P.2d at 529. Further, in light of the statutory sanction already provided for a violation of HRS § 444–2(7), "[t]he added penalty of nonenforceability [of the contract] is a judicial creation" that should not be applied "when it causes great and disproportionate hardship[.]" *Id.* (internal quotation marks and emphasis omitted). Finally, HRS § 444–2(7), unlike HRS § 444–22, did not "provide expressly that its violation [would] deprive [the offending party of its] right to sue on the contract[.]" *Id.* at 128–29, 551 P.2d at 528 (internal quotation marks omitted). Accordingly, we do not believe, under these circumstances, that the "added penalty" of unenforceability of the contract should be imposed on Plaintiffs.

IX.

A.

Defendants rely on *Castro v. Sangles,* 637 So.2d 989 (Fla.Dist.Ct.App.1994), in arguing that the agreement was unenforceable because Plaintiffs violated the provisions of HRS §§ 444–2(7) and –9.1. In *Castro,* Juan and Blanca Castro, the homeowner plaintiffs, brought an action for breach of contract against Sangles, an unlicensed contractor. *Id.* at 990. After entering into the construction agreement, Juan "pulled" a building permit on the "knowing and sworn-to misrepresentations that he was the 'owner-builder' and that no contractor was involved." *Id.* The plaintiffs were dissatisfied with Sangles's performance and brought suit for breach of contract. *Id.* The lower court concluded that plaintiffs were precluded from enforcing the agreement under a statute which explicitly stated, " 'As a matter of public policy, *contracts* entered into on or after October 1, 1990, and *performed in full or in part by any contractor who fails to obtain or maintain his license ... shall be unenforceable in law,* and the court in its discretion may extend this provision to equitable remedies....' " *Id.* at n. 1 (quoting Fla.Stat. § 489.128 (1991))(emphases added). The appellate court affirmed, stating that in its view, "the conclusion that the action is barred by the clear terms of the statute that a contract like

this one is 'unenforceable in law,' ... is entirely correct." *Id.* at 990.

Next, the appellate court observed that "[j]ust as important, one may recover upon an apparently illegal contract only if he himself [or she herself] has not been guilty of wrongdoing—that is ... he [or she] is not **in pari delicto** with the actual malefactor." *Id.* (boldfaced emphasis in original). The court then observed that Juan was

> clearly in pari delicto since it was he who, for his own financial gain, made a specific representation to official authorities, under oath, that the building permit was expressly sought by the owner as builder thereby disavowing the presence of the "general contractor" [Sangles] against whom he now seeks to enforce an alleged ... agreement.

*Id.* Thus, Juan's "improper securing of the building permit ... precluded his recovery." *Id.*

### B.

We believe *Castro* is distinguishable.

In *Castro*, the Florida statute made the contract itself "unenforceable," subject to certain exceptions. In contrast, as previously noted, HRS § 444–22 only bars civil *actions* for "recovery for work done, or supplies furnished, or both" brought by unlicensed contractors.

Secondly, the Florida appellate court did not discuss any penalties that might be im-posed against an owner-builder for violation of the owner-builder exemption.[18] In the instant case, however, HRS 444–2(7) provides for a penalty, a factor not apparently involved in the *Castro* decision.

In sum, these differences distinguish the holding and analysis of *Castro* from the case before us. Accordingly, we conclude that while a party who violates the owner-builder exemption referred to in HRS § 444–2(7) is subject to the sanctions prescribed by statute, that party is not precluded from enforcing the underlying contract with an unlicensed contractor.

### X.

For the foregoing reasons, we (1) affirm findings 1, 7, and 13; (2) vacate finding 11 and the court's conclusions 1, 2, 3, and 4; (3) affirm conclusion 5 as it pertains to Counts II and III but vacate it in all other respects; (4) affirm the judgment with respect to Counts II and III; (5) vacate the judgment with respect to Count I; and (6) remand Count I to the court for further proceedings consistent with this opinion.

---

**18.** After reviewing the text of Florida Statutes Annotated (Fla.Stat.Ann.) (West 1991) chapter 489 entitled "Contracting," referred to in *Castro v. Sangles,* 637 So.2d 989 (Fla.Dist.Ct.App.1994), and the latest enactment of Fla. Stat. Ann. chapter 489 (Supp.1999), we are unable to locate any reference to penalties for violation of the owner-builder exemption of Fla. Stat. Ann. § 489.103(7).