997 P.2d 567

In the Matter of CARL CORPORATION, Petitioner–Appellant,

v.

STATE of Hawai'i, DEPARTMENT OF EDUCATION, Hawai'i State Library System, Respondents–Appellees,

and

Dynix, Inc., dba Ameritech Library Services.

In the Matter of Carl Corporation, Petitioner–Appellant,

v.

State of Hawai'i; Board of Education, State of Hawai'i; Department of Education, State of Hawai'i; Hawai'i State Public Library System, Department of Education, State of Hawai'i, State Procurement Office, Department of Accounting and General Services, State of Hawai'i; Department of the Attorney General, State of Hawai'i, Respondents–Appellees.

No. 21919.

Supreme Court of Hawai'i.

April 24, 2000.

Jeffrey S. Harris and Matt A. Tsukazaki (of Torkildson, Katz, Fonseca, Jaffe, Moore & Hetherington), on the briefs, Honolulu, for petitioner-appellant.

Russell A. Suzuki and James J.S. Chang, Deputy Attorneys General, on the briefs, Honolulu, for respondents-appellees.

Alan M. Oshima, Lawrence M. Reifurth, and Michael A. Okazaki (of Oshima Chun, Fong, & Chung), on the briefs, Honolulu, for intervenor Dynix, Inc.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and Circuit Judge IBARRA, Assigned by Reason of Vacancy.

Opinion of the Court by MOON, C.J.

In this consolidated appeal,[1] (1) appeal No. 21919 arises from an administrative hearing conducted pursuant to this court's remand order in *Carl Corporation v. State of Hawai'i, Department of Education,* 85 Hawai'i 431, 946 P.2d 1, *reconsideration denied,* 85 Hawai'i 431, 946 P.2d 1 (1997) [hereinafter, *CARL I* ] and (2) appeal No. 21984 involves two protests filed by petitioner-appellant Carl Corporation [hereinafter, Carl] against the respondents-appellees State of Hawai'i; Board of Education, State of Hawai'i; Department of Education, State of Hawai'i (DOE); Hawai'i State Library System, Department of Education, State of Hawai'i (the Library); State Procurement Office, Department of Accounting and General Services, State of Hawai'i; and the Department of the Attorney General, State of Hawai'i [hereinafter, collectively, the appellees[2]], for actions they took prior to and following the administrative hearing conducted pursuant to this court's remand order in *CARL I.*

To briefly summarize, prior to *CARL I,* the Library and Ameritech entered into a contract [hereinafter, contract or Ameritech contract] under which Ameritech agreed to

---

1. By order dated July 15, 1999, this court consolidated appeal Nos. 21919 and 21984, under No. 21919, for purposes of disposition.

2. The appellees were named in Carl's protests that culminated in appeal No. 21984. Some of them were also named in appeal No. 21919.

Specifically, appeal No. 21919 involves the DOE, the Library, and additionally, Intervenor Dynix, Inc., dba Ameritech Library Services (Ameritech). Except where necessary to indicate the actions of a particular party, we do not differentiate among particular appellees.

provide computer and other automation services to the Library. Carl, which had submitted a proposal on the automation project, protested the award of the contract to Ameritech and appealed the award to the Department of Commerce and Consumer Affairs (DCCA) Hearings Officer. *See CARL I*, 85 Hawai'i at 436–38, 946 P.2d at 6–8.

The DCCA Hearings Officer remanded the matter to the Library to reevaluate the competing proposals and to decide for itself whether to ratify and affirm the contract or to terminate the contract as provided for in Hawai'i Revised Statutes (HRS) § 103D–707 (1993).[3] *See id.* at 433, 946 P.2d at 3. Thereafter, Carl appealed the Hearings Officer's decision to this court.

In *CARL I*, we rejected the Hearings Officer's conclusion that he lacked authority to determine whether to ratify or terminate the contract. Instead, we vacated the Hearings Officer's decision and remanded the case to the Hearings Officer for the limited purpose of holding "any necessary further hearings, followed by entry of an order . . . ratifying or terminating the contract as provided for in HRS § 103D–707."[4] *Id.* at 461, 946 P.2d at 31.

However, following remand, the Library, under new leadership, terminated the contract pursuant to its terms. As a result of the Library's termination of the contract,

the Hearings Officer closed the evidentiary hearing, ruling that the question whether to ratify or terminate the contract had been rendered moot. It is this decision by the Hearings Officer that Carl now contests in appeal No. 21919.

With respect to its companion appeal in No. 21984, Carl protests the following actions of the appellees: (1) the award of an interim contract to Ameritech to provide various library automation services; and (2) the continuation of such services under the interim contract despite Carl's protest.

Lloyd Unebasami, the Administrator of the State Procurement Office and the Chief Procurement Officer of the Library, denied both protests on the ground that he had exempted the interim contract under HRS § 103D–102(b)(5) (Supp.1998)[5] and thereby removed it from the protection and procedures of the State Procurement Code [hereinafter, the Code]. Thereafter, Carl filed a request for a hearing with the DCCA. The appellees moved to dismiss Carl's request for a hearing before the DCCA Hearings Officer on the ground that Unebasami's exemption under HRS § 103D–102(b)(5) stripped the Hearings Officer of jurisdiction to consider the appeal. The Hearings Officer agreed and dismissed Carl's protests. Thereafter, Carl appealed the Hearing Officer's dismissal or-

---

3. HRS § 103D–707 provides in pertinent part:

 **Remedies after an award.** If after an award it is determined that a solicitation or award of a contract is in violation of law, then:

 (1) If the person awarded the contract has not acted fraudulently or in bad faith:
 (A) The contract may be ratified and affirmed, provided it is determined that doing so is in the best interests of the State; or
 (B) The contract may be terminated and the person awarded the contract shall be compensated for the actual expenses reasonably incurred under the contract, plus a reasonable profit, prior to the termination;
 (2) If the person awarded the contract has acted fraudulently or in bad faith:
 (A) The contract may be declared null and void; or
 (B) The contract may be ratified and affirmed if the action is in the best interests of the State, without prejudice to the State's rights to such damages as may be appropriate.

4. We also remanded to the Hearings Officer to enter an order "awarding CARL its costs of preparing its proposal in response to RFP 96–4 [*i.e.*, the initial request for proposal], and its reasonable attorney's fees in prosecuting its protest and appeal." *CARL I*, 85 Hawai'i at 461, 946 P.2d at 31. The issue of costs and fees associated with the prior protest and appeal, however, is not presently before this court.

5. HRS § 103D–102 provides in pertinent part:

 (b) Notwithstanding subsection (a), *this chapter shall not apply to contracts* by governmental bodies:

 . . . .

 (5) *To procure goods or services* [ ] *. . . which* the policy board determines by rule or *the chief procurement officer determines in writing is available from multiple sources but for which procurement by competitive means is either not practicable or not advantageous to the State* [.]"

 (Emphases added.)

ders to this court in appeal Nos. 21984 and 21985.[6]

With respect to its appeal in No. 21919, Carl argues that: (1) the determination whether to terminate or ratify the contract belonged solely to the Hearings Officer; (2) the Library's "termination" of the contract was, in fact, a ratification of the contract;[7] (3) the Hearings Officer had the authority to determine the method and manner of termination of the contract; and (4) this court has the authority to (a) terminate the contract, (b) appoint a receiver to supervise the next round of requests for proposals, (c) disqualify Ameritech from bidding on the library automation services contract in the future, and (d) award Carl its attorneys' fees and costs in the instant appeal.

Carl further argues, with respect to its appeal in No. 21984, that the Hearings Officer erred in: (5) refusing to determine the validity of the alleged exemption under HRS § 103D–102(b)(5); (6) refusing to find that the alleged exemption under HRS § 103D–102(b)(5) was invalid; and (7) dismissing the two protests by Carl of the interim contract awarded to Ameritech.

Because Carl's arguments with respect to (1), (3), and (4) above lack merit, we affirm the September 24, 1998 decision of the Hearings Officer. Moreover, we hold that the Hearings Officer correctly concluded that he did not have the authority to review the Chief Procurement Officer's exemption determination based on the clear language of HRS § 103D–102(b)(5). Accordingly, we

6. On October 28, 1998, this court consolidated both appeals, Nos. 21984 and 21985, under No. 21984 for purposes of briefing and disposition. As noted previously, appeal Nos. 21919 and 21984 were consolidated, under 21919, for purposes of disposition.

7. At the same time that it terminated the contract, the Library provided Ameritech with a "Request for Exemption" from HRS Chapter 103D, which had been issued by the State's Chief Procurement Officer. This Request for Exemption—the subject of Carl's protests in appeal No. 21984—allowed the Library to enter into an interim automation services contract with Ameritech until "April 14, 1999, or upon the execution of a new, competitively-awarded automation services contract." Carl's argument that the Library and Ameritech never really terminated

also affirm the October 21, 1998 Orders of the Hearings Officer in appeal No. 21984.

## I. BACKGROUND

The following facts and procedural history are taken from this court's decision in *CARL I*, the September 24, 1998 order of the Hearings Officer following remand, and the records on appeal in Nos. 21919 and 21984.

Prior to *CARL I*, the Hearings Officer held hearings to determine whether the award of the contract to provide automation and other services to the Library complied with the Code. The Hearings Officer found that "the entire evaluation process [by which the Library considered the competing proposals of Ameritech and Carl]" was "irretrievably flawed." *CARL I*, 85 Hawai'i at 457, 946 P.2d at 27. As previously indicated, rather than evaluate the competing proposals and decide whether to ratify or terminate the contract himself, the Hearings Officer ordered the Library to reevaluate the proposals and then decide for itself whether to ratify or terminate the contract. *Id.* at 445–46, 946 P.2d at 15–16.

Carl appealed the Hearings Officer's decision to this court, arguing, among other things, that its proposal was the most advantageous to the State and that, therefore, it should have been awarded the contract. We agreed with the Hearings Officer's conclusion that the evaluation process was "irretrievably flawed" and additionally held that the award and performance of the contract was in violation of HRS § 103D–701(f) (1993).[8] *Id.* at

their contract, in essence, involves a challenge to the interim contract arrangements between the Library and Ameritech. As such, argument (2) will be dealt with in our discussion of Carl's appeal in No. 21984. *See infra* Section III.B.

8. HRS § 103D–701(f) provides in pertinent part:
[i]n the event of a timely protest [to the chief procurement officer or the head of a purchasing agency] under subsection (a), *no further action shall be taken on the solicitation or the award of the contract until the chief procurement officer,* after consultation with the head of the using agency, or the head of the purchasing agency, *makes a written determination that the award of the contract without delay is necessary to protect substantial interests of the State.*
(Emphases added.) In *CARL I*, we held that the State Librarian, Bartholomew Kane, acted in

450–52, 454, 946 P.2d at 20–22, 24. We observed, however, that both the Hearings Officer and this court lacked "the technical qualifications to conduct an independent evaluation of the proposals and to determine ... which proposal[, Ameritech's or Carl's,] was most advantageous to the State." *Id.* at 457, 946 P.2d at 27. Notwithstanding this conclusion, we determined that the Hearings Officer improperly remanded to the Library the decision whether to ratify or terminate the automation services contract. *Id.* Consequently, we remanded *to the Hearings Officer* the decision to ratify or terminate the contract. *See id.* at 461, 946 P.2d at 31. Additionally, we directed the Hearings Officer, in making that decision, to consider "the best interest of the State," *id.* at 449, 946 P.2d at 19, which included, among other things, "[t]he public interest in the integrity of the procurement code." *Id.* at 456, 946 P.2d at 26.

On remand, Carl urged the Hearings Officer to terminate the contract based on *CARL I.* The Library and Ameritech initially opposed termination in their briefs to the Hearings Officer. The Hearings Officer scheduled a hearing to allow the parties to introduce evidence on the factors that this court in *CARL I* directed the Hearings Officer to consider in determining the State's best interest.

Although the Library had vigorously defended the contract in *CARL I* and throughout Bartholomew Kane's tenure as State Librarian, a change of leadership at the Library [9] resulted in an abrupt change of strategy immediately prior to the scheduled evidentiary hearing. The new State Librarian, Virginia Lowell, decided to terminate the Ameritech contract rather than continue to litigate its defense and, on September 11, 1998, filed a Notice of Intent to Terminate with the Hearings Officer.

The following day, Lowell prepared an exemption form pursuant to HRS § 103D-102(b)(5) for Unebasami's approval as the

chief procurement officer of the Library. The exemption form stated that the existing Ameritech contract would be terminated and that the Library would need to enter into an interim contract with Ameritech because "filling the [Library's] interim automation service requirements with a vendor other than [Ameritech] is not practicable or advantageous to the State and the [Library]." The exemption form noted, however, that the exemption would last until "April 14, 1999, or upon the execution of a new, competitively-awarded automation services contract" and that "the new competitive procurement for the [Library's] replacement contract will be conducted in strict compliance with Chapter 103D of the Hawai‘i Revised Statutes." Unebasami approved the request for exemption on September 14, 1998.

On the same day, the Library terminated the existing contract pursuant to the contract's General Terms and Conditions. The remand hearing also commenced on the same day, September 14, and, after allowing brief direct examination and cross-examination to determine the validity of the Library's termination of the contract, the Hearings Officer terminated the evidentiary hearing, stating that the issue whether to ratify or terminate the contract had been rendered moot. Thereafter, the Hearings Officer issued an Order and Errata stating:

> First, in [*CARL I*] ..., the *Hawai‘i Supreme Court directed the Hearings Officer to either ratify the subject contract, or terminate the subject contract, pursuant to the provisions of HRS § 103D-707 and* the factors specified by the Hawai‘i Supreme Court. Accordingly, the Hearings Officer concluded that *no other disposition of the subject contract was authorized or permitted* by the Hawai‘i Supreme Court.
>
> Second, *neither the Hawai‘i Supreme Court's decision in [CARL I] ... nor the provisions of HRS § 103D-707, empower the Hearings Officer to create the method or means upon which a contract in viola-*

---

bad faith when he executed the contract with Ameritech *prior to* the "substantial interest" determination required by HRS § 103D-701(f). *See CARL I,* 85 Hawai‘i at 451–52, 946 P.2d at 21–22.

9. The State Board of Education terminated Kane's contract to serve as State Librarian, effective June 30, 1998. Since August 13, 1998, Virginia Lowell has served as State Librarian.

*tion of HRS Chapter 103D may be terminated* over a period of time, or terminated in a particular manner.[10] As such, the Hearings Officer concluded that if the subject contract must be terminated, the provisions of HRS § 103D–707 require that the termination of the contract be effective immediately.

Lastly, *neither the Hawai'i Supreme Court's decision in [CARL I] ... nor the provisions of HRS § 103D–707, expressly precluded the [Library], as the procuring agency, from sua sponte terminating the subject contract if [the Library]* determined that the subject contract was awarded in violation of law. As such, the Hearings Officer concluded that *the [Library,] as the procuring agency, had the authority to terminate the subject contract during the course of the contested case hearing, without the approval of the Hearings Officer. ...*

*IT IS HEREBY ORDERED that* [,] based upon the [Library's] immediate termination of the subject contract ..., *the determination of whether the subject contract should be terminated or ratified is rendered moot.*

(Emphases added.)

Carl objected to the Hearings Officer's decision to terminate the hearing and, when overruled, filed a written offer of proof of the evidence it would have offered had the hearing continued.[11] Carl timely appealed that Order and Errata in appeal No. 21919.

Meanwhile, in response to Unebasami's approval of Lowell's request for an exemption of the interim contract, Carl filed two protests "pursuant to HRS § 103D–701 [ (1993) ]." [12] On September 21, 1998, Carl filed with Lowell and Unebasami a written protest of the interim contract award to Ameritech. On September 28, 1998, Carl filed a second protest of the continuation of services by Ameritech despite its September 21 protest. Unebasami denied both protests on the ground that his exemption under HRS § 103D–102(b)(5) removed the interim contract from the protection of the Code and the jurisdiction of the Hearings Officer.

On October 1, 1998, Carl filed a second request for hearing,[13] and the Hearings Officer opened dockets for both protests, designating the first protest as "PCH 98–7" for the interim contract award and designating the second protest as "PCH 98–8" for the continuation of services despite the first protest. The Hearings Officer then consolidated both protests.

On October 14, 1998, Carl filed a motion for summary judgment in the first protest, PCH 98–7, challenging the validity of the claimed exemption under HRS § 103D–102(b)(5). On October 15, 1998, appellees filed, in PCH 98–8, a motion to dismiss the second request for hearing on the grounds that the exemption was valid, but that, even if it was not, the Hearings Officer lacked jurisdiction to review the validity of the exemption. The following day, appellees filed an identical motion to dismiss in PCH 98–7.

**10.** In a footnote, the Hearings Officer noted: "Similarly, there does not appear to be any authority for a Hearings Officer to modify the terms of a contract if [the] Hearings Officer determines that the subject contract must be ratified under the provisions of HRS § 103D–707."

**11.** Specifically, Carl submitted a written offer of proof, which, it argued, demonstrated that "the Library and Ameritech are continuing to operate under the terms and conditions of [the allegedly terminated] contract as if it had never been terminated." As noted previously, such a claim amounts to a challenge to the post-termination interim contract arrangements between the Library and Ameritech, and are considered *infra*.

**12.** HRS § 103D–701(a) provides in pertinent part that "[a]ny actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or award of a contract may protest to the chief procurement officer or the head of a purchasing agency." Because we hold that the Hearings Officer correctly concluded that he did not have jurisdiction to review Unebasami's exemption determination, we need not address the applicability of HRS § 103D–701 to Carl's protest.

**13.** On September 30, 1998, Carl submitted to the Hearings Officer its first request for hearing because Unebasami had not, at that point, issued any determination on Carl's pending protests. Although it is unclear from the record, it appears that the Hearings Officer initially refused to accept Carl's Request for Hearing. After receiving the denial letter from Unebasami, Carl filed the second request for hearing that was accepted.

On October 20, 1998, the Hearings Officer held a hearing on the appellees' motions to dismiss. According to the Hearings Officer, the issue was "whether or not [he] ha[d] the authority to review a determination of exemption made according to [HRS § 103D–102(b)(5)] and by [administrative] rule." Believing that he did not, the Hearings Officer issued two single-sentence orders on October 21, 1998. With respect to PCH 98–7, the Hearings Officer concluded: "IT IS HEREBY ORDERED that [appellees'] Motion to Dismiss in the above-captioned matter, be, and is hereby granted." With respect to PCH 98–8, the Hearings Officer similarly concluded: "IT IS HEREBY ORDERED that [appellees'] Motion to Dismiss Protestor Carl Corporation's Second Request for Hearing Filed on October 1, 1998, be, and is hereby granted."

Carl timely and separately appealed the Hearings Officer's dismissal orders to this court. The appeal from the order in PCH 98–7 was designated as supreme court appeal No. 21984, and the appeal from the order in PCH 98–8 was designated as appeal No. 21985.[14]

## II. *STANDARD OF REVIEW*

The standard by which this court reviews the decisions of a hearings officer is governed by HRS § 103D–710(e) (1993), which provides that:

> Upon review of the record the court may affirm the decision of the hearings officer issued pursuant to section 103D–709 or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if substantial rights may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the chief procurement officer or head of the purchasing agency;

> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 103D–710(e) (1993). Further, we have stated, based on HRS § 103D–710(e), that:

> conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects [are reviewable] under subsection (3); findings of fact [are reviewable] under subsection (5); and [the Hearings Officer's] exercise of discretion [is reviewable] under subsection (6). Accordingly, a reviewing court will reverse [a Hearings Officer's] finding of fact if it concludes that such ... finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. On the other hand, the [Hearings Officer's] conclusions of law are freely reviewable.

*CARL I*, 85 Hawai'i at 446–47, 946 P.2d at 16–17 (1997) (citing *Hardin v. Akiba*, 84 Hawai'i 305, 310, 933 P.2d 1339, 1344 (1997)).

## III. *DISCUSSION*

As noted previously, we deal here with two separate appeals. First, we address Carl's arguments in appeal No. 21919, in which it generally contends that the Hearings Officer: (1) erred in concluding that termination of the Ameritech contract rendered additional proceedings moot; (2) failed to exercise its authority to determine the method and manner of termination; and (3) failed to provide Carl with other remedies to which it was entitled under the Code.[15] Second, we address Carl's primary argument in appeal No. 21984 that the Hearings Officer erred in refusing to determine the validity of the alleged exemption, under HRS § 103D–

---

14. *See supra* note 6.

15. Carl raises additional issues and arguments, which we address within the context of the contentions listed *supra*.

102(b)(5), of the interim contract arrangements between the Library and Ameritech.

### A. *Appeal No. 21919*

1. **The Hearings Officer Correctly Determined That The Issue On Remand Was Moot.**

As previously stated, Carl's main argument is that the determination whether to ratify or terminate the contract belonged *solely* to the Hearings Officer. In support of this argument, Carl additionally asserts that: (1) this court, in *CARL I*, expressly held that the Library could not make *any* determination on the contract; and (2) the Hearings Officer failed to carry out his responsibility to the public under the Code. As related aspects of the main argument, we address—and reject—each contention in the discussion below.

■ In *CARL I*, we concluded that, where the head of a purchasing agency (*i.e.*, the Library) finds that there was no violation of law, the Hearings Officer, rather than the Library, should make the ratify-or-terminate decision because "a common sense reading of . . . HRS § 103D–707" required the Hearings Officer to make that determination. *See id.* at 455, 946 P.2d at 25. Contrary to Carl's interpretation of *CARL I*, however, our recognition that the Hearings Officer *alone* had the power under HRS § 103D–707 to decide *whether or not* to ratify or terminate the contract did *not* imply that the Library and Ameritech, as parties to the contract, were powerless to terminate the contract by its terms.

■ The September 14, 1998 termination letter, delivered by the State Librarian to Ameritech representatives, invoked Section 6.13 of the contract's General Terms and Conditions. Section 6.13 provides in pertinent part:

(A) Termination for convenience. The procurement officer[16] may, when the interests of the [STATE] so require, terminate this contract in whole or in part, for the convenience of the [STATE]. The procurement officer shall give written notice of the termination to the CONTRACTOR specifying the part of the contract terminated and when termination becomes effective.

Following delivery of the State's termination letter, Ameritech explicitly noted that "the LIBRARY had the authority to, and did in fact, terminate the Contract on its own initiative pursuant to the Contract terms." Moreover, the State Librarian explained on cross-examination at the remand hearing that "[t]he payments as listed in the contract are terminated along with all the rest of the contract." Thus, neither party to the contract disputes the effectiveness of the termination, and the entire contract, including related payments, was terminated upon the letter's delivery.

Carl attacks the Library's and Ameritech's authority to terminate the contract under *CARL I*. Specifically, Carl argues that, "[u]nder the Court's analysis [in *CARL I*,] only one conclusion is possible: If [the Library] could not reevaluate the Ameritech and

16. Although Carl challenges the validity of the termination based, in part, on a claim that Lowell lacked authority to terminate the contract, we reject that challenge for several reasons. First, under the 1997 amendments to the Code, Unebasami—as the administrator of the state procurement office of the department of accounting and general services—was the chief procurement officer for the Library. *See* HRS §§ 103D–203(a)(7) & 103D–204 (1997). Inasmuch as Unebasami specifically approved the "Request for Exemption" based on the fact that the Ameritech contract had been terminated, he must have authorized Lowell's termination of the contract. Second, the contract at issue was witnessed by Bartholomew Kane, Lowell's predecessor, under the title "[Library] procurement officer." Thus, there is support within the contract itself that

Lowell, who stepped into Kane's shoes as his replacement, was the "procurement officer" for purposes of the contract. In this regard, Lowell's letter to Ameritech expressly stated that she was "acting as the procurement officer for the [Library]." Finally, the cases upon which Carl relies for the proposition that the Library lacked authority under the "termination for convenience" clause, *see Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756 (1982); *Krygoski Constr. Co., Inc. v. United States*, 94 F.3d 1537 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997), are inapposite because, in those cases, the person challenging the termination was a *party to the contract*. Here, by contrast, neither party to the contract—the State or Ameritech—contends that the contract remains in effect.

CARL proposals, then it simply had no authority to make the ultimate decision as to the continued effect of the contract." Carl's argument misses the mark.

As noted previously, the effect of this court's decision in *CARL I* was to remove from the Library the option to ratify the contract. This court did not, as Carl contends, expressly hold that the Library could not make *any* determination on the contract. Carl incorrectly infers such a holding from the fact that this court noted the "futility" of remanding to the Library the determination whether Carl should have been awarded the contract in the first instance. Although it is certainly true that, under *CARL I*, the Library lacked the authority to *ratify* the contract, nothing in *CARL I* stripped the parties of their right to terminate the contract by. its terms.

■ Carl next argues that the Hearings Officer failed to carry out his responsibility to the public under the Code. Specifically, Carl argues that, "[b]y allowing [the Library] to make the ultimate determination, . . . . [t]here was no balancing of interests; no determination of the 'best interests of the State' [as this court required in *CARL I*.]" Carl again incorrectly interprets this court's holding in *CARL I*.

In *CARL I*, this court stated that, pursuant to HRS § 103D–707, "[o]nce [a] contract has been awarded, whether or not it is in violation of law, and notwithstanding the prejudice to the aggrieved person or the public, *the contract may still be ratified, providing it is 'in the best interests of the State.'*" *CARL I*, 85 Hawai'i at 449, 946 P.2d at 19. Moreover, we noted that, as part of the determination of the State's best interest, the Hearings Officer must consider, among other things, "the public interest in the integrity of the procurement code." *Id.* at 456, 946 P.2d at 26. *CARL I* only required the Hearings Officer to consider the best interests of the State—and the concomitant interests of the public in the integrity of the procurement code—*prior to contract ratification,* not termination. This conclusion is further supported by the language of HRS § 103D–707, which only mentions the "best interests of the State" with respect to contract ratification, not termination. Thus, whatever considerations may have driven the Library to terminate the contract, the Hearings Officer did not fail to carry out his responsibility under the Code because he did not need to consider the best interest of the State in accepting the parties' *termination* of the contract.

■ Additionally, we agree with the Hearings Officer's primary conclusion that, "based upon the [Library's] immediate termination of the subject contract . . ., *the determination of whether the subject contract should be terminated or ratified is rendered moot.*" (Emphasis added.) This court has repeatedly noted that,

[a] case is moot where the question to be determined is abstract and does not rest on existing facts or rights. Thus, the mootness doctrine is properly invoked where "events . . . have so affected the relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised."

*In re Application of Thomas,* 73 Haw. 223, 226, 832 P.2d 253, 254 (1992) (quoting *Wong v. Board of Regents, University of Hawaii,* 62 Haw. 391, 394, 616 P.2d 201, 203–04 (1980)).

In *Wong,* a student at the University of Hawaii sought injunctive and declaratory relief to enjoin the University from imposing disciplinary action against him. Specifically, Wong sought (1) an injunction to halt a student hearing against him and (2) a declaratory judgment that the Statement of Disruption of the Community Standards of the University [hereinafter, Statement] to be used against him at a disciplinary action was in violation of Hawai'i Administrative Procedure Act (HAPA). By stipulation entered into after the circuit court's ruling, the University abandoned its intention to discipline Wong and further agreed that no mention of the charges would be included in his school record. Further, the University brought the challenged Statement into compliance with HAPA.

Addressing the requirement under the mootness doctrine that an effective remedy

be available, the *Wong* court noted that "historically the objection to deciding moot cases was that the judgment of the court could not be carried into effect, or that relief was impossible to grant. Mootness was then a remedial issue related to the ability of the court to grant prospective relief. . . ." *Wong*, 62 Haw. at 395, 616 P.2d at 204. In light of the University's abandonment of the disciplinary hearing and the compliance of the Statement with HAPA, the *Wong* court concluded that, "[i]n effect, there is nothing left to grant [Wong]." *Id.* at 396, 616 P.2d at 205.

As in *Wong*, this court lacks the ability to fashion an effective remedy in the instant appeal. The *CARL I* court remanded the case to the Hearings Officer to determine whether to "ratify[ ] or terminat[e] the contract as provided for in HRS § 103D–707." *CARL I*, 85 Hawai'i at 461, 946 P.2d at 31. Once the Library terminated the contract by its terms, there was no contract left to ratify on remand. In other words, "there was nothing left to grant" Carl. *Cf. Wong*, 62 Haw. at 396, 616 P.2d at 205. Although Carl argues that it is entitled to˝a range of remedies—including disqualification of Ameritech from future bidding and a role in determining the Library's interim contract arrangements—the only remedy to which Carl was entitled *on remand* was a determination whether the State's best interests justified ratification of the contract or whether the contract should have been terminated, which was precisely the result here. *See CARL I*, 85 Hawai'i at 449, 946 P.2d at 19 ("*[T]he award of the contract* before it has been determined whether the solicitation or proposed award is in violation of law *effectively limits the relief available to the person aggrieved by the solicitation or award* [.]" (Emphases added.)).

■ In its reply brief, Carl implies that the type of issue here falls within an exception to the mootness rule for cases where the "question involved affects the public interest, and . . . is likely in the nature of things . . . [to] aris[e] in the future." *See Thomas*, 73 Haw. at 226, 832 P.2d at 255 ("There is an exception to . . . [the mootness rule], however, that occurs in cases involving a legal issue which is capable of repetition, yet evading

review. The phrase, 'capable of repetition, yet evading review,' means that 'a court will not dismiss a case on the grounds of mootness where a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit.' " (Quoting *Life of the Land v. Burns*, 59 Haw. 244, 251, 580 P.2d 405, 409–10 (1978))). Notwithstanding Carl's suggestion to the contrary, this case does not fall within that exception.

Although the present controversy clearly involves matters of public concern, the failure of Carl to obtain its requested relief stems not from the fact that this court could not address its arguments in time, but because it received the only relief available under the Code (*i.e.*, termination of the contract). Although we may need to revisit future protests and appeals over Library procurement decisions, inasmuch as no additional "authoritative determination" is needed regarding the terminated contract here, the exception to the mootness rule does not apply. *Cf. Wong*, 62 Haw. at 396–97, 616 P.2d at 205; *Life of the Land*, 59 Haw. at 251–52, 580 P.2d at 410.

Accordingly, the Hearings Officer correctly invoked the mootness doctrine because, as a practical matter, at least one of the "two conditions for justiciability relevant on appeal [*i.e.*, effective remedy] . . . ha[s] been compromised." *Thomas*, 73 Haw. at 226, 832 P.2d at 254 (internal quotation marks omitted). Inasmuch as this particular case does not fall within the exception to the mootness rule, we reject Carl's arguments to the contrary.

### 2. The Hearings Officer Did Not Have The Authority To Determine The Method And Manner Of Termination.

■ Carl next argues that the Code "directly provides the Hearings Officer with the authority to craft appropriate relief," which he should have used to "open[ ] the remand hearing to evidence on the method and manner of the termination." Carl contends that its "evidence" would have demonstrated sev-

eral beneficial methods by which the Hearings Officer could have terminated the Ameritech contract and preserved the integrity of the Code. Inasmuch as Carl not only misapprehends this court's decision in *CARL I*, but also misinterprets the Hearings Officer's powers under the Code, we reject its argument.

In discussing the scope of the Hearings Officers powers, Carl quotes the following passage from *CARL I*:

> hearings officers have jurisdiction and authority to act on protested solicitations and awards in the same manner and to the same extent as contracting officials authorized to resolve protests under HRS § 103D–701. .

*CARL I*, 85 Hawai'i at 456, 946 P.2d at 26. Moreover, relying on Hawai'i Administrative Rules (HAR) § 3–126–38, Carl contends that "the Hearings Officer has 'in the best interest of the State' the power 'to terminate or to amend, ratify, and affirm the contract.'" Carl's reliance on the quoted language from *CARL I* and the HAR is misplaced.

The language Carl quotes from *CARL I* stemmed from this court's discussion of Carl's entitlement to bid preparation costs under HRS § 103D–701(g) (1993). In particular, subsection 701(g) provides for the award of "reasonable costs incurred in connection with the solicitation, including bid preparation costs." HRS § 103D–701(g). Although we do not express an opinion here as to the full extent of hearings officers' powers, this court did not, in *CARL I*, rely upon HRS § 103D–701 to suggest that the Hearings Officer on remand possessed a broader. power to determine the method or manner of termination of the Ameritech contract awarded in violation of the Code.

Moreover, Carl's interpretation of HAR § 3–126–38, as providing the Hearings Officer with the power to "amend" the contract, is disingenuous. This court specifically—and repeatedly—noted in *CARL I* that the Hearings Officer's only task on remand was to ratify or terminate the contract "as provided for in HRS § 103D–707." *CARL I*, 85 Hawai'i at 461, 946 P.2d at 31. We additionally explained that, "[w]here the chief procurement officer ... finds that there was *no* violation of law, and, ... a Hearings Officer finds otherwise [as in *CARL I* ], HAR § *3–126–38 has no application.*" *Id.* at 455, 946 P.2d at 25. Thus, this court specifically noted that, on remand, *only* HRS § 103D–707 applied and HAR § 3–126–38 did not.[17]

Finally, nothing in HRS § 103D–707 or *CARL I* authorized the Hearings Officer to dictate the method or manner of contract termination. HRS § 103D–707 only states that "[t]he contract may be terminated and the person awarded the contract [*i.e.,* Ameritech] shall be compensated for the actual expenses reasonably incurred under the contract, plus a reasonable profit, prior to the termination[.]" HRS § 103D–707(1)(B).[18] This language does not, as Carl contends, authorize the Hearings Officer to force the sale of Ameritech's computer system to the Library or require the Library and Ameritech to enter into a lease transaction that

---

17. Carl misrepresents one of the holdings of *CARL I* when it states that "[t]he Court also held that the Hearings Officer could revise the solicitation 'to comply with law by eliminating Ameritech's proposal from consideration, which would have had the same effect.'" In point of fact, this court expressly stated that such a remedy—available under HRS § 103D–706 *prior to* contract execution—did *not* apply to Carl's situation because "the contract had already been executed." *CARL I*, 85 Hawai'i at 450, 946 P.2d at 20.

18. At the remand hearing, and in its briefs on appeal, Carl attempted to offer evidence "that [the Library] and Ameritech intentionally and willfully conspired to violate State procurement laws." Such evidence, although deeply troubling if true, does not alter the result here. For, even under HRS § 103D–707(2), which governs "remedies after an award" where "the person awarded the contract has acted fraudulently or in bad faith," the best result for which Carl could hope would be a declaration that the Ameritech contract was "null and void." *See* HRS § 103D–707(2)(A). At this stage of the proceedings, a finding that the Ameritech contract is "null and void" would not put *Carl* in a better position because the contract at issue has already been terminated. Thus, at this stage of Carl's protest and appeal in No. 21919, Carl's proffered evidence is irrelevant. Although such evidence is not relevant to the instant appeal because the parties terminated the subject contract, we express no opinion as to the relevance and admissibility of such evidence in future proceedings involving arrangements between the Library and Ameritech. *See infra* note 20.

would allow another company, presumably Carl, to provide continuing automation services.

As noted previously, the Hearings Officer only had the authority, pursuant to this court's remand order in *CARL I* and HRS § 103D–707, to decide whether to ratify or terminate the contract. The parties to the contract terminated it by its terms and effectively rendered moot the primary question before the Hearings Officer.

### 3. With Respect To Carl's Protest In The Remand Hearing, Carl Has Received All the Relief to Which It Is Entitled Under CARL I And The Code.

Next, Carl makes several arguments regarding the types of relief available under the Code. Specifically, Carl contends that this court has the authority to (1) terminate the contract, (2) appoint a receiver to supervise the next round of requests for proposals, (3) disqualify Ameritech from bidding on the library automation services contract in the future, and (4) award Carl its attorneys' fees and costs in the instant appeal. For the following reasons, we reject each of these contentions.

#### a. *The contract has already been terminated.*

Carl argues that, "[b]ased upon the policy concerns raised in *CARL I,* the Court should find that the integrity of the Procurement Code is protected only by the termination of the unlawful Ameritech contract." As previously explained, the Library and Ameritech terminated the contract prior to the remand hearing. Having determined that the contract has already been terminated and that the Hearings Officer correctly determined that the issue was moot, there is no need for this court to terminate the contract yet again.

#### b. *The court should not appoint a receiver.*

Carl next argues that this court should appoint a receiver to oversee the subsequent procurement of the new automation systems. In particular, Carl contends that,

[g]iven [the Library's] practice of manipulating the Procurement Code, the Court cannot be assured that it will carry out and comply with the Court's instructions on any subsequent remand of this protest. To ensure compliance with its instructions, the Court should appoint a receiver to supervise the solicitation of the new automation system. The temporary appointment of a receiver would not displace the role of the State Librarian or of the policy decisions of [the Library]. [The Library] would decide what type of functions they desire and the objectives they wish to achieve in an automation system. The receiver would simply oversee the procurement and carry out the functions, which would normally be handled by a procurement officer.

In support of its request for a receiver, Carl relies heavily upon *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental Retardation,* 424 Mass. 430, 677 N.E.2d 127 (1997) [hereinafter, *Judge Rotenberg* ].

In *Judge Rotenberg,* the Massachusetts Supreme Judicial Court upheld the appointment of a receiver to oversee the State Department of Mental Retardation after that department was held in contempt for violating a settlement agreement pertaining to the treatment of patients at a facility for disabled persons. The *Judge Rotenberg* court began its analysis of the receivership issue by explaining that "[a] receivership must be thoroughly justified on the facts, is always to be considered a remedy of 'last resort,' and therefore is not often applied in practice." *Judge Rotenberg,* 677 N.E.2d at 149 (internal quotation marks and citation omitted). The *Judge Rotenberg* court then listed the extraordinary factors justifying the appointment of a receiver in that case. Specifically, the court had determined that the State Department of Mental Retardation had: (1) "repeatedly violated [a] settlement agreement"; (2) "interfered with court-authorized treatment orders"; (3) "bypassed the court-appointed monitor"; and (4) "knowingly misled the judge." *See id.* at 150 (footnote omitted).

None of the extraordinary circumstances listed in *Judge Rotenberg* are present in the instant appeal. First, although it is true that this court determined that former State Librarian, Bartholomew Kane, executed the Ameritech contract in "bad faith," *CARL I*, 85 Hawai'i at 451, 946 P.2d at 21, Kane has been replaced by a new State Librarian, who, on the current record, has not engaged in any "bad faith" conduct. Second, the procedural posture of the instant appeal differs markedly from that in *Judge Rotenberg*, where the department, after repeated violations of a settlement agreement and court orders, refused to "acknowledge any wrongdoing in [a] contempt action." *Judge Rotenberg*, 677 N.E.2d at 150. Here, the new State Librarian specifically acknowledged, "[b]ased on [her] own analysis of the Protest, ... that the best way to resolve the Protest lies in turning a corner away from the original request for proposals that led to the current [Library] contract with [Ameritech], and starting fresh with a new competitive procurement of automation services." Contrary to Carl's contentions, by terminating the contract according to its terms, the Library did not violate this court's orders on remand.

In sum, the extraordinary circumstances that justified the appointment of a receiver in *Judge Rotenberg* are simply absent in the present appeal. We therefore reject Carl's request for the appointment of a receiver to supervise the Library's next Request for Proposals.

c. *The court should not disqualify Ameritech.*

■ Carl next contends that, "[i]n *CARL I*, the Court recognized the authority of the Hearings Officer to disqualify an offending vendor to remedy a violation of the Procurement Code." In support of its argument that the Hearings Officer could have, and should have, disqualified Ameritech from bidding on future Library contracts, Carl quotes the following language: "[T]he Hearings Officer ... could ... have ordered the cancellation of the solicitation and precluded Ameritech from submitting a proposal on any subsequent solicitation based on the same specifi-

cations[.]" *CARL I*, 85 Hawai'i at 450, 946 P.2d at 20. Putting aside the fact that this court cannot know whether the Library's next Request For Proposals will involve the "same specifications," Carl's contention, at best, misapprehends this court's statements in *CARL I* and, at worst, misrepresents them.

In *CARL I*, this court repeatedly noted that Carl's remedies were *limited* by the fact that the Library had executed the contract with Ameritech. Immediately prior to the language Carl quotes *supra*, this court stated that, *"[h]ad the contract not been executed, the relief Carl seeks[, which included the potential disqualification of Ameritech from submitting a proposal,] would have been available." CARL I*, 85 Hawai'i at 450, 946 P.2d at 20. We went on to explain, however, that

> *[b]ecause the contract had already been executed, ...* even if the Hearings Officer or this court agreed that Ameritech's proposal should not have been considered, *the only remedy available is ratification or termination of the contract pursuant to HRS § 103D–707*, not the award of the contract to CARL as the only responsive, qualified bidder.

*Id.* (Emphasis added). Thus, this court did *not* hold, as Carl contends, that, under the circumstances of this case, "the unfair advantage [can] only [be] resolved by precluding the offending vendor from bidding on the solicitation."

Even aside from this court's holding that Carl's remedies were limited to ratification or termination, Carl's request that this court debar Ameritech at this stage of the proceedings presents other problems as well. As Ameritech contends in its answering brief, it would be inappropriate for this court to debar Ameritech at this time. HRS § 103D–710(a) provides jurisdiction to review "a final decision of a hearings officer under section 103D–709." HRS § 103D–712 provides that "[r]equests for judicial review under section 103D–710 shall be filed in the supreme court within ten calendar days *after the issuance of a written decision by the hearings officer under section 103D–709.*"

The "written decision" that the hearings officer has the authority to make under HRS § 103D–709 is "whether the determinations of the chief procurement officer ... were in accordance with the Constitution, statutes, [and] regulations[.]" HRS § 103D–709(f). In the instant case, the chief procurement officer has not even addressed, let alone determined, the existence of causes sufficient to support debarment of Ameritech as provided under HRS § 103D–702.[19] Nor has there been a proceeding or decision under HRS § 103D–709 to consider the State's *failure* to act under HRS § 103D–702.[20] Thus, there is no "written decision" on the subject of Ameritech's debarment which this court can review. *See* HRS § 103D–712(b).

For the reasons discussed *supra*, we reject Carl's attempts, in the instant appeal, to disqualify Ameritech from bidding in the Library's next Request for Proposals.

d. *Insofar as it has not prevailed in appeal No. 21919, Carl should not be awarded its costs and fees.*

■ Finally, Carl requests that this court "award Carl its attorney fees [sic] and costs in this judicial review," because "[a]ll of the attorney's fees and costs incurred by CARL were the direct result of the unjustified and illegal acts and conduct of [the Library] and the Attorney General." Because the facts permeating the instant appeal differ marked-

ly from the facts that justified the imposition of attorneys' fees and costs[21] in *CARL I*, we reject Carl's request.

Initially, it should be noted that Carl seeks only costs associated with appeal No. 21919. However, unlike this court's award of bid preparation costs in *CARL I*, HRS § 103D–701(g)[22] does not authorize the award of costs associated with an appeal. To determine whether the costs associated with a litigant's appeal should be awarded, this court looks to Hawai'i Rules of Appellate Procedure (HRAP) Rule 39 (1995). HRAP 39 states that "*if a judgment is affirmed* ..., *costs shall be taxed against the appellant* ... unless otherwise ordered." (Emphases added.) Because we affirm the September 24, 1998 decision of the Hearings Officer, Carl would not be entitled to recover its costs under HRAP 39.

With respect to Carl's attorneys' fees, this court, in *CARL I*, explained the test to be used in determining whether to grant a successful bidder's request for such fees:

[B]ecause the legislature has failed to provide any statutory remedy for bad faith conduct on the part of the purchasing agency, and because requiring the protestor to bear the financial burden of enforcing the Code under these circumstances undermines the purposes of the Code, we hold that a protestor is entitled to recover

---

19. HRS § 103D–702 (1993) lists the "causes for debarment" and provides in pertinent part that "the chief procurement officer ... may debar a person for cause from consideration for award of contracts."

20. HRS § 103D–702 and its implementing regulations, HAR §§ 3–126–11 to 3–126–18 (1995), vest authority to debar or suspend in "the chief procurement officer" and expressly reserve a role for the "contractor or prospective contractor who is to be suspended [or debarred]" in such proceedings. *See* HAR §§ 3–126–12 & –14. Although we do not decide the issue today, we note that the circumstances surrounding Carl's protest in the remand hearing demonstrate the wisdom of not reading HRS § 103D–702 so narrowly as to *prohibit* participation of others, such as aggrieved bidders (*e.g.*, Carl), from offering relevant evidence at suspension or debarment proceedings associated with future bids or RFPs. *Cf. CARL I*, 85 Hawai'i at 450, 946 P.2d at 20 ("Had the contract not been executed .... the Hearings Officer ... could either have ordered

the cancellation of the solicitation and precluded Ameritech from submitting a proposal on any subsequent solicitation based on the same specifications or have revised the solicitation to comply with law by eliminating Ameritech's proposal from consideration, which would have had the same effect.")

21. In *CARL I*, this court awarded Carl its "bid preparation costs pursuant to HRS § 103D–701(g)," *CARL I*, 85 Hawai'i at 456, 946 P.2d at 26, and remanded for the Hearings Officer to hold hearings and enter an order awarding Carl such costs. *See supra* note 4. Here, Carl seeks costs associated with its appeal of the Hearing Officer's decision in the remand hearing.

22. HRS § 103D–701(g) provides in pertinent part that "when a protest is sustained ... then the protesting bidder or offeror shall be entitled to *the reasonable costs incurred in connection with the solicitation, including bid preparation costs ....*"

its attorney's fees incurred in prosecuting its protest if: (1) the protestor has proven that the solicitation was in violation of the Code; (2) the contract was awarded in violation of HRS § 103D–701(f); and (3) the award of the contract was in bad faith.

CARL I, 85 Hawai'i at 460, 946 P.2d at 30 (citation omitted). Thus, this court awarded Carl its attorneys' fees based on the recognition that the Code had a "built-in disincentive for an aggrieved participant to pursue a protest past the agency stage once the contract ha[d] been awarded." Id.

Although the "built-in disincentives" of the Code still exist, they are not implicated by the facts of the instant appeal. Here, Carl is not challenging the *award* of a contract—it is challenging the fact that the Library and Ameritech, rather than the Hearings Officer, *terminated* the previously-awarded contract. At base, Carl seeks, among other things, to have this court impose certain conditions on the contract termination. Inasmuch as Carl achieved the only remedy to which it was entitled on remand—termination of the contract—the equities that justified the imposition of attorneys' fees in *CARL I* do not exist.

Recognizing that this case falls outside the rubric of *CARL I*, the default American rule applies. As this court recently observed:

> Normally, pursuant to the "American Rule," each party is responsible for paying his or her own litigation expenses. This general rule, however, is subject to a number of exceptions: attorney's fees are chargeable against the opposing party when so authorized by statute, rule of court, agreement, stipulation, or precedent.... [T]his court has applied the exception where the wrongful act of the defendant causes the plaintiff to litigate with a third party.

*Fought & Co., Inc. v. Steel Engineering and Erection, Inc.*, 87 Hawai'i 37, 50–51, 951 P.2d 487, 500–01 (1998) (citation omitted). Under the circumstances of the instant appeal, the Code does not authorize the recovery of Carl's attorneys' fees, and Carl has not cited any additional "statute, rule of court, agreement, stipulation, or precedent" that would

justify such an award. *See id.* at 51, 951 P.2d at 501.

In sum, under the circumstances of this case, Carl is *not* entitled to recover its (1) costs under HRAP 39 or (2) attorneys' fees under the exceptional rule announced in *CARL I.* Accordingly, we reject Carl's request for costs and attorneys' fees associated with the prosecution of its current appeal in 21919.

### B. *Appeal No. 21984*

■ As stated previously, Carl, in response to Unebasami's approval of Lowell's request for an exemption of the interim contract, filed two protests. At a hearing with respect to Carl's motion for summary judgment in the first protest and the appellees' motions to dismiss both protests, the Hearings Officer agreed with the appellees' position, describing the issue before him as "whether or not I have the authority to review a determination of exemption made according to statute and by rule.... The issue really is which forum[, the circuit court or the DCCA,] has primary jurisdiction to conduct that review." Believing that he did not have jurisdiction, the Hearings Officer granted the appellees' motions and dismissed both of Carl's protests, and Carl appealed.

■ Whether the circuit court or another court has jurisdiction to hear objections regarding the procurement officer's conclusion was not a determination within the authority of the Hearings Officer. *See* HRS § 103D–709 (defining the scope of administrative review available under HRS Chapter 103D). Moreover, the broad question regarding "which forum," if any, has primary jurisdiction to review a chief procurement officer's determination of exemption is not properly before us. We, therefore, decline to address it here. Rather, the dispositive issue before this court is whether the Hearings Officer correctly concluded that he did not have the authority, *i.e.* jurisdiction, to review the Chief Procurement Officer's determination that the interim contract at issue was exempt from the requirements of the Code.

■ Here, the Hearings Officer had authority, in the first instance, to determine his

own jurisdiction. *Cf. HOH Corp. v. Motor Vehicle Indus. Licensing Bd., Dept. of Commerce and Consumer Affairs*, 69 Haw. 135, 141, 736 P.2d 1271, 1275 (1987) (noting that "an administrative agency may always determine questions about its own jurisdiction" (citations and internal quotation marks omitted)). The existence of jurisdiction is a question of law that is reviewed *de novo* under the right/wrong standard. *See, e.g., Lester v. Rapp*, 85 Hawaiʻi 238, 241, 942 P.2d 502, 505 (1997).

HRS § 103D–709 defines the scope of administrative review under Chapter 103D. Subsection (f) specifically states:

> Hearings officers shall decide whether the determinations of the chief procurement officer or the head of the purchasing agency, or their respective designees were in accordance with the Constitution, statutes, regulations, and the terms and conditions of the solicitation or contract.

HRS § 103D–709(f). However, the clear and unambiguous language of HRS § 103D–102(b)(5), the authority under which Unebasami granted the Library's requested exemption, appears to preclude the application of any part of Chapter 103D. HRS § 103D–102 states in relevant part:

> **Application of this chapter.** (a) This chapter shall apply to all procurement contracts made by governmental bodies whether the consideration for the contract is cash, revenues, realizations, receipts, or earnings, any of which the State receives or is owed; in-kind benefits; or forebearance; provided that nothing in this chapter or rules adopted hereunder shall prevent any governmental body from complying with the terms and conditions of any other grant, gift, bequest, or cooperative agreement.
>
> (b) Notwithstanding subsection (a), *this chapter **shall not apply** to contracts by governmental bodies:*
>
> . . . .
>
> (5) *To procure goods or services,* including the following:
>
> (A) Services of expert witnesses for potential and actual litigation of legal matters involving the State, its agencies, and its officers and employees, including administrative quasi-judicial proceedings;
>
> (B) Works of art for museum or public display;
>
> (C) Research and reference materials including books, maps, periodicals, and pamphlets, which are published in print, video, audio, magnetic, or electronic form;
>
> (D) Meats and foodstuffs for the Kalaupapa settlement;
>
> (E) Opponents for athletic contests;
>
> (F) Utility services whose rates or prices are fixed by regulatory processes or agencies;
>
> (G) Performances, including entertainment, speeches, and cultural and artistic presentations;
>
> (H) Goods and services for commercial resale by the State;
>
> (I) Services of printers, rating agencies, support facilities, fiscal and paying agents, and registrars for the issuance and sale of the State's or counties' bonds; and
>
> (J) Travel arrangements purchased by the University of Hawaii for its intercollegiate athletic programs;

*which* the policy board determines by rule or *the chief procurement officer determines in writing is available from multiple sources but for which procurement by competitive means is either not practicable or not advantageous to the State.*

(Emphases added.) Consequently, Chapter 103D's provisions for administrative and judicial review of Unebasami's denial of Carl's protests may not have been available. In other words, the Hearings Officer's authority to review "determinations of the chief procurement officer" are not available if HRS § 103D–102(b)(5) is read literally.

 We note that, generally, where there is no ambiguity in the language of the statute, *and the literal application of the language would not produce an absurd or unjust result* clearly inconsistent with the purposes and policies of the statute, there is no room for judicial construction and interpretation, and the

statute must be given effect according to its plain and obvious meaning.

*In re Doe*, 90 Hawai'i 246, 253, 978 P.2d 684, 691 (1999) (emphasis in original) (citations omitted). As we stated in *CARL I*, the purposes of the Code are to: "(1) *Provide for fair and equitable treatment* of all persons dealing with the government procurement system; (2) Foster broad-based competition among vendors while *ensuring accountability*, fiscal responsibility, and efficiency in the procurement process; and (3) Increase public confidence in the *integrity* of the system." *CARL I*, 85 Hawai'i at 456, 946 P.2d at 26 (quoting Sen. Stand. Comm. Rep. No. S8–93, in 1993 Senate Journal, at 39) (emphases added). The concept of disallowing administrative review of contracts awarded pursuant to HRS § 103D–102(b) clearly promotes efficiency in the procurement process because it brings finality to awards of such contracts. At the same time, however, one could conclude that there is a conflict between disallowing administrative review and other policy considerations underlying the Code, particularly those of providing for fair and equitable treatment, ensuring accountability, and increasing confidence in the integrity of the system. In attempting to reconcile this possible conflict, we are mindful that the task of statutory construction requires that we "ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Peterson v. Hawaii Elec. Light Co., Inc.*, 85 Hawai'i 322, 328, 944 P.2d 1265, 1271 (1997) (citations omitted). In so doing, "the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool." *Id.* (citation omitted).

The legislature amended HRS § 103D–102 in 1995 in order to "clarify and streamline the provisions of the Hawaii Public Procurement Code (Code), to achieve the objectives of cost-effectiveness and accountability[.]" Stand. Comm. Rep. No. 811, in 1995 House Journal, at 1333. Review of the legislative history of the 1995 amendments indicates that the legislature fully intended to exempt from administrative review the chief procurement officer's exemption determinations.

■ Senator Richard M. Matsuura testified in opposition to the bill amending the Code. He noted that "[s]ection 3 of this bill contains a list of *exemptions from the procurement code*." Testimony of Senator Richard M. Matsuura on Conf. Comm. Rep. No. 38, in 1995 Senate Journal, at 665 (emphasis added). On presentation of the bill for final reading, Senator Matsuura raised the same concerns he had raised at the time the bill was presented for third reading and prior to the bill's referral to conference committee. At the time of final reading, Senator Matsuura stated in pertinent part:

> The regular procurement process contains all kinds of safeguards to make sure that one person alone cannot make such a decision [as provided for under HRS § 103D–102(b)(5) ]. It insures that all parties have an open and fair chance to compete. There is a written record which justifies each decision. But when you *throw all of that away*, you are leaving yourself open to abuse.
>
> .... *Now we're going to allow a non-bid process again with this bill.*
>
> ... *All of these activities and all of these services don't have to go through the bidding process if we pass this bill. You can just go to non-bid selection process.*
> ...

*Id.* at 465–66 (emphases added). Senator Matsuura's testimony suggests that the legislature was cognizant of the fact that contracts awarded pursuant to HRS § 103D–102(b)(5) would be exempt from the competitive bidding process and would not be subject to review under Chapter 103D. Notwithstanding the concerns raised by Senator Matsuura, the bill passed third reading, conference committee, and final reading, without modification. Thus, in amending HRS § 103D–102(b)(5), the legislature appears to have intended to preclude administrative review of contracts awarded thereunder. To the extent that there is a conflict between disallowing administrative review and other policy considerations underlying the Code, such matters are best left to the legislature to resolve, if it deems such resolution necessary or appropriate. *See Lee v. Corregedore*, 83 Hawai'i 154, 171, 925 P.2d 324, 341 (1996) (stating that broad, public policy decisions best left for legislature). Accordingly, we

hold that HRS § 103D–102(b) precludes administrative review of a chief procurement officer's exemption determination and that the Hearings Officer correctly concluded that he did not have jurisdiction to review Unebasami's determination that the interim contract at issue was exempt from the requirements of the Code.

## IV. *CONCLUSION*

For the foregoing reasons, we affirm the Order and Errata of the Hearings Officer in appeal No. 21919 as well as the October 21, 1998 Orders of the Hearings Officer in appeal No. 21984.