**\*\*\* FOR PUBLICATION IN WEST'S HAWAII REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-28762
17-APR-2013
10:48 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

DISTRICT COUNCIL 50, OF THE INTERNATIONAL UNION OF PAINTERS AND
ALLIED TRADES and ALOHA GLASS SALES & SERVICE, INC.,
Petitioners/Plaintiffs-Appellants,

vs.

KEALIʻI S. LOPEZ, in her capacity as Director,
Department of Commerce and Consumer Affairs,
Respondent/Defendant-Appellee.

SCWC-28762

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 28762; CIV. NO. 07-1-0310)

APRIL 17, 2013

NAKAYAMA, ACTING C.J., MCKENNA, J.,
AND CIRCUIT JUDGE SAKAMOTO IN PLACE OF POLLACK, J., RECUSED,
WITH CIRCUIT JUDGE KIM IN PLACE OF RECKTENWALD, C.J., RECUSED,
CONCURRING AND DISSENTING, WITH WHOM CIRCUIT JUDGE TOʻOTOʻO,
IN PLACE OF ACOBA, J., RECUSED, JOINS

OPINION OF THE COURT BY NAKAYAMA, ACTING C.J.

In 2005, the State of Hawaiʻi contracted with general contractor Allied Pacific Builders, Inc. (Allied Pacific) to complete the renovation of Lanakila Elementary School.  The project included extensive glazing work, specifically the

fabrication and installation of 476 jalousie windows. Allied Pacific holds a C-5 specialty license in "[c]abinet, millwork, and carpentry remodeling and repairs," but it does not hold a specialty glazing license.

The Department of Commerce and Consumer Affairs's (DCCA) Contractors License Board (the Board) concluded that Allied Pacific could complete the jalousie window work pursuant to its C-5 license. The Board determined that the jalousie window work qualified as "incidental and supplemental" to the remodeling and repair work authorized under Allied Pacific's C-5 license. We hold that because the Board did not consider the cost and extent of the work when determining if that work qualified as "incidental and supplemental" to the project, the Board's interpretation of the "incidental and supplemental" exception is contrary to law and contrary to the primary purpose of the legislation regarding contractor licensing.

## I. BACKGROUND

### A. Factual Background

This case arises from the State of Hawaii's renovation project known as "Lanakila Elementary School Renovate and Paint Various Buildings DAGS Job No. 52-16-5581" (the Project). On

January 31, 2005,[1] the Department of Education (DOE), State of

Hawaiʻi, and the Department of Accounting and General Services

(DAGS), Public Works Division, issued a Notice to Bidders

(Notice) describing the work involved in the Project.  The Notice

stated:

> The work generally consists of replacement of windows, floor covering, tackboards, whiteboards, electrical light fixtures, switches, receptacles and cover plates, doors and door frames, finish hardware, termite damaged wood, gypsum wallboard partition, sinks and cabinets, re-keying of locks, interior and exterior painting, cast-in-place concrete, concrete repairs, concrete masonry, and some minor repair work.
>
> . . . .
>
> To be eligible to submit a Bid, the Bidder must possess a valid State of Hawaii Contractor's license classification B.

Included within the Project was the installation of 476

aluminum jalousie windows, containing approximately 10,390 vinyl

slats.  The Project specifications required that "[f]abrication

and installation of jalousie windows shall be done by skilled and

experienced mechanics to the best standard of the trade and in

accordance with the approved shop drawings."  Under one estimate,

the window work cost $372,875, representing approximately 20% to

25% of the total project cost.[2]  This type of window work falls

_____

[1]      The hearings officer misstated the date of the Notice as March 3, 2005, and this mistake was replicated in the Intermediate Court of Appeals' (ICA) memorandum opinion.  See District Council 50 v. Lopez, No. 28762, 2012 WL 3044105, at *1 (App. July 26, 2012) (mem. op.).  The final date for the submission of bids on the project was March 3, 2005.

[2]      This estimate was submitted by Petitioner Aloha Glass Sales and Service, Inc. in a declaration.  Though the hearings officer declined to adopt

(continued...)

3

within the C-22 specialty license for glaziers.[3]  See Hawai'i

Administrative Rules (HAR) § 16-77-28(c) (incorporating Exhibit A

into the chapter) (hereinafter HAR § 16-77-28(c), Exhibit A).

The Notice also included detailed instructions

explaining how and why DOE and DAGS required bidders to specify

subcontractors in the bid.  The instructions provided, in

pertinent part:

> 1. Bidder shall complete the "Joint Contractors or
> Subcontractors List".  It is the sole responsibility of the
> Bidder to review the requirements of this project and
> determine the appropriate specialty Contractor's licenses
> that are required to complete the project.  Failure of the
> Bidder to provide the correct names, license numbers,
> specialty class number, classification description and to
> indicate that the specialty Contractor is required for this
> project, may cause the bid to be rejected.
>
> 2. Bidder agrees the completed listing of Joint Contractors
> or Subcontractors is required for the project and that the
> Bidder, together with the listed Joint Contractors and
> Subcontractors, have all the specialty Contractor's licenses
> to complete the work.
>
> 3. Based on the Hawaii Supreme Court's January 28, 2002
> decision in Okada Trucking Co., Ltd. v. Board of Water
> Supply, et al., 97 Hawaii 450 (2002), the Bidder as a

---

[2](...continued)
this estimate in his findings of fact, he referenced it in his conclusions of
law.

[3]    A C-22 specialty license authorizes "Glazing and tinting
contractor[s]":

> To glaze or tint frames, panels, sash, and doors.  To
> assemble and install window wall and curtain wall, shower
> doors, tub enclosures, mirrors, metal windows and screens,
> metal sliding doors, metal jalousies, store front metal and
> trim, plastics, tempered glass doors; including items such
> as frames and hardware and any allied products not stated
> above but affiliated with the glass and glazing industry[.]

Hawai'i Administrative Rules (HAR) § 16-77-28(c) (incorporating Exhibit A into
the chapter) (emphasis added).

4

General Contractor ('A' or 'B' license) is prohibited from undertaking any work solely or as part of a larger project, which would require the Bidder ('A' or 'B' General Contractor) to act as a specialty ('C' license) Contractor in any area in which the Bidder ('A' or 'B' General Contractor) has no specialty Contractor's license. Although the 'A' and 'B' Contractor may still bid on and act as the "Prime Contractor" on an 'A' or 'B' project (See, HRS §[]444-7 for the definitions of an "A" and "B" project), respectively, the 'A' and 'B' Contractor may only perform work in the areas in which they have the appropriate Contractor's license. The Bidder ('A' or 'B' General Contractor) must have the appropriate 'C' specialty Contractor's licenses either obtained on its own, or obtained automatically under HAR §[]16-77-32.

On December 20, 2005, DOE and DAGS accepted low bidder Allied Pacific's bid on the Project. Allied Pacific is licensed as a "B" general building contractor[4] and, therefore, holds an automatic C-5 specialty license.[5] See HAR § 16-77-32(c) (2004).

_____

[4]     HAR § 16-77-32(c) provides:

Licensees who hold the "B" general building contractor classification shall automatically hold the following specialty classifications without further examination or paying additional fees:
(1)   C-5 cabinet, millwork, and carpentry remodeling and repairs;
(2)   C-6 carpentry framing;
(3)   C-10 scaffolding;
(4)   C-12 drywall;
(5)   C-24 building moving and wrecking;
(6)   C-25 institutional and commercial equipment;
(7)   C-31a cement concrete;
(8)   C-32a wood and vinyl fencing;
(9)   C-42a aluminum and other metal shingles;
(10) C-42b wood shingles and wood shakes.

[5]     The C-5 license authorizes specialty contractors

[t]o install cabinets, cases, sashes, doors, trims, or nonbearing partitions that become a permanent part of [sic] structure, and to remodel or to make repairs to existing buildings or structures, or both; and to do any other work which would be incidental and supplemental to the remodeling or repairing. The repairs, carpentry work, or remodeling shall include the installation of window shutters, garage
(continued...)

5

Allied Pacific's bid listed a number of subcontractors holding specialty contractor licenses, but did not list any subcontractor holding a C-22 glazing and tinting license. It is undisputed that Allied Pacific does not possess a C-22 license. District Council 50, 2012 WL 3044105, at *3.

B.    **Procedural Background**

On or about March 24, 2006, District Council 50 of the International Union of Painters and Allied Trades (DC 50)[6] and Aloha Glass Sales & Service, Inc. (Aloha Glass)[7] (collectively, Petitioners) filed a Petition for Declaratory Ruling (Petition) with DCCA's Contractors License Board. The Board referred the Petition to the Office of Administrative Hearings for further proceedings on April 26, 2006. The Petition was filed pursuant to Hawaiʻi Revised Statutes (HRS) § 444-4(9) (1995)[8] and HAR §

_____

[5](...continued)
        doors, bifold, and shutter doors; and the installation of manufactured sidings and any other work that would not involve changes or additions to the building's or structure's basic components such as, but not limited to foundations, beams, rafters, joists, or any load bearing members or sections[.]

HAR § 16-77-28(c), Exhibit A (emphasis added).

[6]    DC 50 is a union representing glaziers and glass workers, carpet and soft tile installers, and drywall finishers.

[7]    Aloha Glass is a C-22 licensed specialty glazing contractor.

[8]    HRS § 444-4(9) provides that "[i]n addition to any other powers and duties authorized by law, the board shall: Issue informal nonbinding interpretations or declaratory rulings, and conduct contested case proceedings . . . ."

16-201-48 (1990).[9] This statute, and the rule implementing it, allows the Board to issue declaratory rulings regarding statutes, rules, and orders governing contractors. See HRS § 444-4(9); HAR § 16-201-48. Petitioners sought a ruling that "[a] general building contractor with a B-license cannot engage in work requiring a C-22 subcontractor license under the general contractor's license."[10]

---

[9] HAR § 16-201-48 provides that "[t]he department or any interested person may petition the authority for a declaratory ruling as to the applicability of any statutory provision or of any rule or order adopted by the authority to a factual situation."

[10] The Petition raised three additional issues:

> 2. Where more than 1% of the work under a public works project requires a C-22 license, a general building contractor with a B-license cannot perform that work, but must engage a subcontractor possessing a C-22 subspecialty license;
>
> 3. The State of Hawai'i may not accept bids from a contractor for a public works contract who has failed to name each person or firm to be engaged by the bidder as a subcontractor where it is not in the best interest of the State and the value of the work to be performed by the joint contractor or subcontractor is greater than 1% of the total bid amount; and
>
> 4. The bid of the B-licensed contractor described herein should not have been accepted and the lowest bidder listing a C-22 specialty subcontractor should have been awarded the contract.

The Board determined that it did not have jurisdiction over these issues because they required the Board to interpret HRS § 103D-302(b) (Supp. 2006). HRS § 103D-302 governed competitive sealed bidding then as it does today. As specified in HRS § 103D-701(a) (Supp. 2006), only an "actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or award of a contract may protest to the chief procurement officer or a designee" under chapter 103D. On appeal, the circuit court held that "the Board [did] not have expertise in or jurisdiction over HRS § 103D-302(b) or chapter 103D in general, thus the Court finds that, for the purposes of this appeal, it also has no jurisdiction over the Procurement

(continued...)

Petitioners' argument was based on their interpretation of HRS §§ 444-9 (1993) and 444-8(c) (1993), and our opinion in Okada Trucking, 97 Hawaiʻi 450, 40 P.3d 73 (2002). HRS § 444-9 contains a broad prohibition against unlicensed work:

> No person within the purview of this chapter shall act, or assume to act, or advertise, as general engineering contractor, general building contractor, or specialty contractor without a license previously obtained under and in compliance with this chapter and the rules and regulations of the contractors license board.

HRS § 444-8(c) creates a general exception for specialty contractors to complete work for which they are unlicensed if the work is "incidental and supplemental" to licensed work:

> This section shall not prohibit a specialty contractor from taking and executing a contract involving the use of two or more crafts or trades, if the performance of the work in the crafts or trades, other than in which the specialty contractor is licensed, is incidental and supplemental to the performance of work in the craft for which the specialty contractor is licensed.

(emphasis added). Petitioners argued that "incidental and supplemental" must be interpreted narrowly so as not to "'expand the scope of work in which a general engineering contractor may engage.'" They interpreted Okada Trucking as "explicitly stat[ing] that neither an 'A' nor 'B' licensee could engage in 'incidental and supplemental' work in trades or crafts in which it is not licensed."

---

[10](...continued)
Code. . . . [T]hus the only issues appropriate for appeal are the decisions of the Board, which only reached HRS Chapter 444." Petitioners did not appeal this determination.

The hearings officer issued his recommendations on October 26, 2006. The hearings officer concluded: "The jalousie window replacement work can be undertaken by a C-22 specialty contractor, and a C-5 specialty contractor provided that the work is incidental and supplemental to the renovation work for which the C-5 contractor is licensed to perform." The hearings officer interpreted Okada Trucking as holding only that a general building contractor could not perform work for which it was not licensed. Therefore, work that falls under the "incidental and supplemental" provision is licensed and the performance of this work by a general contractor would not violate Okada Trucking.

In interpreting the terms "incidental and supplemental," the hearings officer relied upon the definition found in HAR § 16-77-34. This rule defines "incidental and supplemental" as "'work in other trades directly related to and necessary for the completion of the project undertaken by a licensee pursuant to the scope of the licensee's license.'" The hearings officer noted that this definition of "incidental and supplemental" does not take into consideration the cost or extent of work. Based on this definition, the hearings officer concluded that the jalousie window work was "incidental and supplemental" to the Project. Accordingly, the hearings officer recommended that the Board deny the Petition. On January 22,

9

2007, the Board adopted the hearings officer's recommended decision as the Board's final order.

Petitioners appealed to the circuit court.  On September 12, 2007, the circuit court affirmed the Board's final order.[11]  The circuit court reasoned that it was the Board's duty as the finder of fact to determine the scope of licensing and "there is nothing to prohibit the Board from determining and interpreting HRS chapter 444 such that jalousie window work representing 20% to 25% of the total project meets the definition of incidental and supplemental under HAR § 16-77-34."

Petitioners thereafter filed a secondary appeal with the ICA.  On July 26, 2012, the ICA issued its memorandum opinion.  See District Council 50, 2012 WL 3044105, at *1.  The ICA held that, because Petitioners did not demonstrate that the Board's interpretation of "incidental and supplemental" was clearly erroneous or inconsistent with the underlying legislative purpose, the circuit court did not err in affirming the Board's final order.  Id. at *5.

Petitioners timely filed an application for writ of certiorari on October 18, 2012.  This court accepted Petitioners' application on December 3, 2012 and heard oral argument on

---

[11]    The Honorable Eden Elizabeth Hifo presided.

10

January 17, 2013.

## II.  STANDARD OF REVIEW

## A.  Secondary Judicial Review of an Administrative Decision

The review of a circuit court's decision upon its review of an agency's decision is a secondary appeal.  Haw. Teamsters & Allied Workers, Local 966 v. Dep't of Labor & Indus. Relations, 110 Hawaiʻi 259, 265, 132 P.3d 368, 374 (2006).  In a secondary appeal, "'Hawaii appellate courts apply the same standard of review as that applied upon primary review by the circuit court.'"  AlohaCare v. Ito, 126 Hawaiʻi 326, 341, 271 P.3d 621, 636 (2012) (quoting Kaiser Found. Health Plan, Inc. v. Dep't of Labor & Indus. Relations, 70 Haw. 72, 80, 762 P.2d 796, 800-01 (1988)).  The applicable standard of review for administrative appeals is set forth in HRS § 91-14(g) (1993), which provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
> (2) In excess of the statutory authority or jurisdiction of the agency; or
> (3) Made upon unlawful procedure; or
> (4) Affected by other error of law; or
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary, capricious, or characterized by abuse

11

> of discretion or clearly unwarranted exercise of
> discretion.[12]

See also AlohaCare, 126 Hawaiʻi at 341, 271 P.3d at 636 (applying HRS § 91-14(g) when evaluating a petition seeking a declaratory ruling under HAR § 16-201-48).  "[U]nder HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)."  Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union, Local 142, 112 Hawaiʻi 489, 499, 146 P.3d 1066, 1076 (2006) (alterations in original) (quoting In re Hawaiian Elec. Co., 81 Hawaiʻi 459, 465, 918 P.2d 561, 567 (1996)).

"'An agency's interpretation of its rule receives deference unless it is plainly erroneous or inconsistent with the underlying legislative purpose.'"  Haw. Teamsters, 110 Hawaiʻi at 265, 132 P.3d at 374 (quoting Int'l Bhd. of Elec. Workers v. Hawaiian Tel. Co., 68 Haw. 316, 322, 713 P.2d 943, 950 (1986)).  The agency's "interpretation of a statute is a question of law reviewable de novo."  Okada Trucking, 97 Hawaiʻi at 458, 40 P.3d

---

[12]    The ICA cited HRS § 103D-710(e) (2011) for a similar standard of review.  District Council 50, 2012 WL 3044105, at *2 (citing Arakaki v. State, Dep't of Accounting & Gen. Servs., 87 Hawaiʻi 147, 149, 952 P.2d 1210, 1212 (1998)).  However, HRS § 103D-710(e) is not applicable because, unlike the petitioner in Arakaki, Petitioners here did not file their petition pursuant to HRS chapter 103D, the Procurement Code.

at 81.  We have stated that:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
>
> In construing an ambiguous statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning."  HRS § 1-15(1) (1993).  Moreover, the courts may resort to extrinsic aids in determining legislative intent.  One avenue is the use of legislative history as an interpretive tool.

Gray v. Admin. Dir. of the Court, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (internal brackets, ellipses, and footnote omitted) (quoting State v. Toyomura, 80 Hawai'i 8, 18-19, 904 P.2d 893, 903-04 (1995)).

## III.  DISCUSSION

### A.   The Board's decision was not inconsistent with our opinion in Okada Trucking

Petitioners have repeatedly argued that the Board's broad definition of "incidental and supplemental" would, if upheld, "eviscerate" and "emasculate" this court's opinion in Okada Trucking.  They quote Okada Trucking for the principal that "'if a particular project for which a general engineering contractor has obtained a contract requires work in a specialty classification in which it is not licensed to operate . . . the

13

general engineering contractor cannot, pursuant to HRS § 444-9, undertake to perform that specialty work itself.'" Under Petitioners' interpretation, the Board's definition of "incidental and supplemental" violates Okada Trucking by allowing general contractors to perform all specialty work that is related to and necessary for the completion of a project, regardless of whether the general contractor holds the requisite specialty licenses. However, Petitioners fail to appreciate the significant factual differences between Okada Trucking and this case and the specificity of our holding in Okada Trucking.

Okada Trucking involved a contract for an "A" general engineering contractor to construct a booster station for the City and County of Honolulu Board of Water Supply ("BWS"). 97 Hawai'i at 452, 40 P.3d at 75. It was uncontested that the contract included plumbing work requiring a C-37 specialty contracting license. Id. at 452-53, 40 P.3d at 75-76. BWS awarded the contract to low bidder Inter Island Environmental Systems, Inc. (Inter Island), despite the fact that its bid did not "disclose the name of and the nature and scope of work to be performed by a C-37 licensed plumbing subcontractor." Id. at 453, 40 P.3d at 76.

Okada Trucking Co., Ltd. (Okada Trucking), the second lowest bidder on the contract, protested the award of the

14

contract to Inter Island. Id. at 453-54, 40 P.3d at 76-77. The DCCA hearings officer concluded that "it was not in the BWS's or the public's best interests to have waived the disclosure requirement" and therefore it was unlawful to do so. Id. at 455, 40 P.3d at 78.

The ICA vacated the hearings officer's decision, holding that Inter Island was not required to list a C-37 licensed subcontractor in its bid or retain a C-37 licensed subcontractor to complete the specialty plumbing work. Id. at 457, 40 P.3d at 80.

This court accepted Okada Trucking's application for writ of certiorari. Id. at 451, 40 P.3d at 74. We held that the ICA erred in holding that Inter Island could complete the specialty plumbing work under its general contracting licenses. Id. at 457, 40 P.3d at 80. We concluded that "pursuant to HRS § 444-9, a general engineering or building contractor is prohibited from undertaking any work, solely or as part of a larger project, that would require it to act as a specialty contractor in an area in which the general contractor was not licensed to operate."[13]

---

[13] We remanded the case to the ICA to consider the points of error that Inter Island raised on appeal from the hearings officer's decision. Okada Trucking, 97 Hawai'i at 462, 40 P.3d at 85. The ICA dismissed the appeal as moot due to Okada Trucking's completion of the original contract. Okada Trucking Co., Ltd. v. Bd. of Water Supply, No. 22956, 2002 WL 32056914, at *1 (App. Apr. 29, 2002)(Order Dismissing Appeal). We granted the subsequent application for writ of certiorari and held that Inter Island's

(continued...)

Id. at 462, 40 P.3d at 85 (emphasis in original).

We discussed the implications of the "incidental and supplemental" provision of HRS § 444-8(c), and the limiting provision of HRS § 444-9, in a footnote:

> The foregoing provisions, to the extent that they permit a specialty contractor to engage in "incidental and supplemental" work in trades or crafts in which it is not licensed do not similarly expand the scope of work in which a general engineering contractor may engage. Rather, as to general engineering contractors, HRS §§ 444-8 and 444-9, as well as HAR §§ 16-77-32 through 16-77-34, expressly constrain them from engaging in any operations for which they are not duly licensed.
>
> More importantly, however, in the present matter, no party has ever contended that Inter Island could undertake the plumbing work required by the project because that work was "incidental and supplemental" to work that Inter Island was duly licensed to undertake. Inasmuch as we are not fact-finders and given that the hearings officer expressly found that the project required work in the C-37 plumbing classification, the ICA erred in construing the foregoing provisions to support its holding that the project in the present matter did not require specialized plumbing work that Inter Island was not duly licensed to undertake.

Id. at 461-62 n.16, 40 P.3d at 84-85 n.16 (emphasis added). This text clarifies that the "incidental and supplemental" provision applies only to specialty contractors and not to general "A" or "B" contractors. However, we also qualified this conclusion by stating that the most important factor in our determination that

---

[13](...continued)
question fell within an exception to the mootness doctrine "because it involves a matter of public concern and is capable of repetition yet evading review." Okada Trucking Co., Ltd. v. Bd. of Water Supply, 99 Hawaiʻi 191, 192, 53 P.3d 799, 800 (2002) (Okada Trucking II). On remand, the ICA held that, although Inter Island's bid was non-responsive because it did not list a C-37 licensed subcontractor, BWS was authorized to waive this de minimis violation and accept Inter Island's bid. Okada Trucking Co., Ltd. v. Bd. of Water Supply, 101 Hawaiʻi 68, 76-80, 62 P.3d 631, 639-43 (App. 2002).

a C-37 specialty contractor was required to complete the specialty plumbing work was the parties' uncontested admission of this fact. Id.

Both Okada Trucking and the present application consider under what circumstances a general contractor is required to subcontract with a contractor holding a "C" specialty contracting license. However, the cases differ in two significant aspects. First, in Okada Trucking, the parties conceded that the work could only be completed by a contractor holding a specialty license that Inter Island did not possess. Here, however, the Board concluded, and Allied Pacific has consistently maintained, that Allied Pacific may complete the specialty window work under its C-5 license. Second, neither party in Okada Trucking argued that Inter Island could complete the specialty work because it was "incidental and supplemental" to the licensed work. Whereas here, the Board specifically held that Allied Pacific could complete the jalousie window work under the "incidental and supplemental" provision in its automatic C-5 specialty license.

Okada Trucking's holding dictates only that a general contractor may not engage in work requiring a specialty license that the general contractor does not hold. See Okada Trucking, 97 Hawaiʻi at 462, 40 P.3d at 85. We did not foreclose the

17

possibility of a specialty contractor completing work falling outside of their specialty license if that work was incidental and supplemental to licensed work, as provided for by HRS § 444-8(c). Here, the Board concluded that the jalousie window work qualified as "incidental and supplemental" to Allied Pacific's C-5 specialty license. Therefore, pursuant to the Board's interpretation, the jalousie window work could be completed under the C-5 specialty license, and did not require a C-22 specialty glaziers license. The Board's decision was based on Allied Pacific's status as a C-5 specialty license holder, and not its status as a general "B" contractor. Because the Board determined that Allied Pacific could complete the jalousie window work under its C-5 specialty license, its conclusion did not violate our holding in Okada Trucking.

**B.    The Board's interpretation of the "incidental and supplemental" provision is plainly erroneous and inconsistent with the underlying legislative purpose**

In this case, the Board interpreted the "incidental and supplemental" provision in HRS § 444-8(c), the "incidental and supplemental" provision in the C-5 specialty license at HAR § 16-77-28(c), Exhibit A, and the definition of "incidental and supplemental" contained in HAR § 16-77-34. Statutory interpretations are reviewed de novo and the "agency's interpretations of its rules receives deference unless it is

18

plainly erroneous or inconsistent with the underlying legislative purpose." Haw. Teamsters, 110 Hawaiʻi at 265, 132 P.3d at 374. "Although judicial deference to agency expertise is generally accorded where the interpretation and application of broad or ambiguous statutory language by an administrative tribunal are subject to review, this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history." Morgan v. Planning Dep't, Cnty. of Kauaʻi, 104 Hawaiʻi 173, 180, 86 P.3d 982, 989 (2004). Because the Board's interpretation of its rules was plainly erroneous and contrary to the clear meaning of the statute, it is not entitled to deference.

1. The Board's interpretation of "incidental and supplemental" was plainly erroneous under HRS § 444-8(c)

In their application for writ of certiorari, Petitioners argue that the ICA erred in deferring to the Board's interpretation of the "incidental and supplemental" provision of HRS § 444-8(c) and that the Board's interpretation was clearly erroneous, contrary to law, and arbitrary and capricious. Because "incidental" and "supplemental" are common words, Petitioners look to the dictionary to find their "ordinary and customary meanings" and the dictionary yields definitions of "incidental" and "supplemental" which, when combined, form:

19

"something 'minor' added to the whole." They argue that the Board's holding "that the statutory terms 'incidental and supplemental' have nothing to do with 'the extent or cost of the work'" is contradictory to the ordinary meaning of the words. Petitioners conclude that if "incidental and supplemental" are defined as "necessary and indispensable," as stated in HAR § 16-77-34, "the exception swallows the rule": a specialty contractor licensed to complete work making up 1% of the project could complete the remaining 99% of the work under this interpretation of the "incidental and supplemental" provision.

HRS chapter 444 (1993 & Supp. 2012) governs the regulation of contractors.[14] It divides contractors into three classifications: general engineering, general building, and specialty. HRS § 444-7 (1993). Generally, contractors may only perform work for which they are properly licensed. See HRS §

---

[14] HRS § 444-1 (1993) defines a "contractor" as:

> any person who by oneself or through others offers to undertake, or holds oneself out as being able to undertake, or does undertake to alter, add to, subtract from, improve, enhance, or beautify any realty or construct, alter, repair, add to, subtract from, improve, move, wreck, or demolish any building, highway, road railroad, excavation, or other structure, project development, or improvement, or do any part thereof, including the erection of scaffolding or other structures or works in connection therewith.
>    "Contractor" includes a subcontractor, a specialty contractor, and any person, general engineering, general building, or specialty contractor who performs any of the activities listed in the previous paragraph directly or indirectly for the federal government.

444-8(a) (1993) ("The contractors license board may adopt rules and regulations necessary to effect the classification of contractors . . . and may limit the field and scope of the operations of a licensed contractor to those in which the contractor is classified and qualified to engage . . . ."). However, HRS § 444-8(c) creates an exception for specialty contractors to perform "incidental and supplemental" work outside of their licensed area of expertise:

> This section shall not prohibit a specialty contractor from taking and executing a contract involving the use of two or more crafts or trades, if the performance of the work in the crafts or trades, other than in which the specialty contractor is licensed, is incidental and supplemental to the performance of work in the craft for which the specialty contractor is licensed.

(emphasis added).

In interpreting the HRS § 444-8(c) exception for specialty contractors to complete unlicensed "incidental and supplemental" work, we must give effect to the plain and obvious meaning of the language. See Leslie v. Bd. of Appeals of Cnty. of Haw., 109 Hawaiʻi 384, 393, 126 P.3d 1071, 1080 (2006). To determine the ordinary meaning of terms not statutorily defined, we may use "legal or other well accepted dictionaries." Id. "Incidental" is defined as: "[s]ubordinate to something of greater importance; having a minor role." Black's Law Dictionary 830 (9th ed. 2009). "Supplemental" is defined as: "supplying

21

something additional; adding what is lacking." Id. at 1577. Therefore, the ordinary meaning of "incidental and supplemental" is "subordinate to something of greater importance and supplying something additional."

Applying the ordinary meaning of "incidental and supplemental" to HRS § 444-8(c), it is apparent that the legislature meant to provide specialty contractors with a limited ability to perform work outside of their licensed specialty area. However, the "incidental and supplemental" work must not make up the majority of the project, and must instead be "subordinate" and in addition to licensed work "of greater importance."

Under DCCA's rules implementing HRS chapter 444, a "B" general contractor such as Allied Pacific may not "undertake a contract unless it requires more than two unrelated building trades or crafts or unless the general building contractor holds the specialty license to undertake the contract. Work performed which is incidental and supplemental to one contractor classification shall not be considered as unrelated trades or crafts." HAR § 16-77-33(b) (emphasis added).

"B" general building contractors automatically hold several specialty contracting licenses, including the C-5 cabinet, millwork, and carpentry remodeling and repairs license. HAR § 16-77-32(c). The C-5 specialty license is the only

specialty license that specifically provides for contractors to perform "incidental and supplemental" work outside of their licensed specialties.  See HAR § 16-77-28(c), Exhibit A.  The C-5 license allows the licensee "[t]o install cabinets, cases, sashes, doors, trims, or nonbearing partitions that become a permanent part of [sic] structure, and to remodel or to make repairs to existing buildings or structures, or both; and to do any other work which would be incidental and supplemental to the remodeling or repairing."  HAR § 16-77-28(c), Exhibit A (emphasis added).  DCCA's rules define "incidental and supplemental" as any "work in other trades directly related to and necessary for the completion of the project."  HAR § 16-77-34.

The Board's interpretation of the rules provides no limitation on the amount of specialty work that may be completed as incidental and supplemental to C-5 licensed work.  See id. For remodeling and repair projects falling under the purview of a "B" general building contractor, the contractor may complete various types of work pursuant to its automatic C-5 specialty license.  Under the Board's interpretation, if the contractor is qualified to complete some of the work under the C-5 license, the contractor may complete any other work that is "related to and necessary for the completion of the project."

23

By statute, the Board is required to "[a]dopt, amend, or repeal such rules as it may deem proper fully to effectuate" HRS chapter 444.  HRS § 444-4(2).  Therefore, the "incidental and supplemental" exception in the C-5 license must be interpreted in accord with the language of HRS § 444-8(c).  While HRS § 444-8(c) created a narrow exception for unlicensed work that is "subordinate to something of greater importance and supplying something additional," the Board's expansive interpretation of the "incidental and supplemental" exception creates a loophole for C-5 contractors to complete unlimited amounts of specialty work for which they do not hold the requisite specialty licenses. The Board's refusal to consider cost and extent of work when determining whether that work qualifies as "incidental and supplemental" is plainly erroneous in light of the clear meaning of HRS § 444-8(c).

2.    The Board's interpretation of "incidental and supplemental" is inconsistent with the Legislature's underlying purpose

Petitioners argue that the Board's definition of "incidental and supplemental" is "without meaning or substance and fails to carry out the Legislature's 'manifest purpose.'" They also argue that no deference is accorded to agency interpretations that contravene the legislative purpose.  They go so far as to argue that "[t]o allow a general contractor to

24

perform any specialty work so long as it is 'directly related to and necessary for' a project regardless of the 'extent' or 'cost' of that specialty work would render all specialty licensing laws meaningless."

The purpose behind contractor licensing laws in Hawaiʻi is to "protect the general public against dishonest, fraudulent, unskillful or unqualified contractors." Jones v. Phillipson, 92 Hawaiʻi 117, 125, 987 P.2d 1015, 1023 (App. 1999) (quoting 1957 Haw. Sess. L. Act 305, at 358-67). In accordance with this principal, the stated purpose of HRS chapter 444 is "the protection of the general public." Okada Trucking, 97 Hawaiʻi at 459, 40 P.3d at 82 (quoting HRS § 444-4(2) (Supp. 2000)). The legislature has stated that HRS chapter 444 was "enacted, in part, to ensure the health and safety of the public by requiring that contractors possess a minimum level of expertise, experience and training." Jones, 92 Hawaiʻi at 125, 987 P.2d at 1023 (emphasis omitted) (quoting Hse. Stand. Comm. Rep. No. 727-96, in 1996 House Journal, at 1309).

In furtherance of the purpose of HRS chapter 444, the Board must "adopt such rules as it deems proper fully to implement its authority and to enforce the provisions of HRS ch. 444 and the rules adopted pursuant thereto." Okada Trucking, 97 Hawaiʻi at 459, 40 P.3d at 82 (citing HRS §§ 444-4(2), (3), and

(4)).  To protect public health and safety, the Board's rules must ensure that fully qualified contractors are completing all major work involved in a particular project.

The Board's broad definition of "incidental and supplemental" allows C-5 specialty contractors to complete substantial amounts of work for which they are unlicensed.  A C-5 contractor may not possess the minimum level of expertise, experience, and training to complete this unlicensed work.  If such work is poorly completed, it could present a grave risk to public health and safety.  Because the Board's interpretation of "incidental and supplemental" contravenes the manifest legislative purpose of the statute, it is entitled to no deference.[15]

In creating the "incidental and supplemental" provision in HRS § 444-8(c), the legislature crafted an exception for the

---

[15]    Though neither party has raised the issue of mootness, it is the duty of the court "to decide actual controversies . . . and not to give opinions upon moot questions."  Wong v. Bd. of Regents, Univ. of Haw., 62 Haw. 391, 394, 616 P.2d 201, 204 (1980).  A case is moot if "the question to be determined is abstract and does not rest on existing facts or rights."  CARL Corp. v. State, Dep't of Educ., 93 Hawaiʻi 155, 164, 997 P.2d 567, 576 (2000).  Although the record is silent, the Project, which began in 2006, was likely completed several years ago.  Therefore, Petitioners' question regarding whether a general "B" contractor could complete the Project's jalousie window work under a C-5 license is most likely moot.  However, this court has "repeatedly recognized an exception to the mootness doctrine in cases involving questions that affect the public interest and are 'capable of repetition yet evading review.'"  Okada Trucking II, 99 Hawaiʻi at 196, 53 P.3d at 799 (quoting CARL Corp., 93 Hawaiʻi at 165, 997 P.2d at 577).  Because Petitioners' question regarding the scope of a general "B" license is a matter of public concern that will likely arise in the future and become moot before it can receive appellate review, it qualifies for the mootness exception.

completion of limited amounts of unlicensed work.  This exception must be interpreted narrowly to preserve the statute's overarching purpose of protecting public safety by insuring that work is completed by fully competent contractors.  In order to comply with this statutory provision, and the overall purpose of HRS chapter 444, the "incidental and supplemental" exception to the C-5 license must be similarly limited.  By allowing C-5 specialty contractors to complete <u>all</u> work related to and necessary for the completion of a renovation project, regardless of cost and extent, the Board is contravening the express purpose of HRS chapter 444.

### IV.  CONCLUSION

For the foregoing reasons, we vacate the ICA's judgment and the circuit court's judgment and remand to the Board to reconsider whether the jalousie window work qualified as "incidental and supplemental" to the Project in light of the cost and extent of work involved.

| | |
|---|---|
| Michael A. Lilly and Valerie M. Kato for petitioners | /s/ Paula A. Nakayama |
| | /s/ Sabrina S. McKenna |
| Lei S. Fukumura, Deborah Day Emerson and Rodney J. Tam for respondent | /s/ Karl K. Sakamoto |

